Gomer EVANS *v.* ARKANSAS RACING COMMISSION
& OAKLAWN JOCKEY CLUB, INC.

80-92                                        606 S.W. 2d 578
Supreme Court of Arkansas
Opinion delivered October 20, 1980
Rehearing denied November 24, 1980

*Putman, Gallman & Dickson*, by: *James W. Gallman*, for appellant.

*Byron Freeland*, of *Mitchell, Williams, Gill & Selig* and *Friday, Eldridge & Clark*, by: *Herschel H. Friday*, for appellees.

DARRELL HICKMAN, Justice. Gomer Evans, a thoroughbred horse owner and trainer, was denied permission by the Oaklawn Jockey Club, Inc., to race his horses during the 1980 racing season. Oaklawn, a private corporation, operates the Oaklawn Race Track at Hot Springs, Arkansas, by virtue of a state franchise.

The Arkansas Racing Commission, a state agency charged with the regulation of Oaklawn, held three hearings in the Evans matter. Evans was granted a temporary license at one hearing and a regular one-year or seasonal license at the second hearing. Oaklawn refused to permit Evans to race his horses despite the license. At the third hearing the Com-

mission did not order Oaklawn to permit Evans to race. The Pulaski County Circuit Court upheld the Commission's actions on appeal.

Evans appeals from that judgment alleging five errors. First, Evans argues that he had, as a licensee, a property interest and was entitled to protection by due process of law; second, that he did not receive due process in a proper hearing; third, Oaklawn, while a private corporation, could not exclude Evans under its common law property rights; fourth, he was denied his rights without substantial evidence; and, finally, the Commission was legally empowered to overrule Oaklawn's decision to exclude Evans despite his license.

Oaklawn argues that the Commission's ruling was lawful, but, in any event, as a private corporation it had the common law right to exclude Evans for whatever reasons it chose. At the final hearing, a question was raised whether the Commission had the power to order Oaklawn to permit Evans to race his horses. In any event, the Commission denied Evans' appeal and declined to overrule Oaklawn's actions. On appeal the Commission argues that even if it had that authority, it declined to exercise the power because Oaklawn has the right to make certain business judgments and this was one of them.

We affirm the circuit court judgment and the Commission's actions.

The facts are not seriously disputed. Evans has a substantial stable of thoroughbreds, raising horses in Arkansas, Oklahoma and Illinois. He has raced his horses at tracks in Arkansas, Illinois, New Jersey, New York, and Louisiana. Evans has raced horses as a trainer or owner at Oaklawn since 1954 and has been licensed for all those years with a one-year or seasonal license. Oaklawn operates the only thoroughbred race track in Arkansas; the racing season usually begins in February of each year and runs for about 60 days.

In late 1979 only one Oaklawn steward signed Evans' application for a license, three being required. Oaklawn did

not grant Evans any stall space for his horses as it had in past years and refunded his money for a spectator's box. It is undisputed that Oaklawn gave Evans no reasons for these actions. Evans was justified in concluding that he was being denied access to Oaklawn as an owner or trainer for the 1980 racing season.

Subsequently, Evans filed an appeal with the Arkansas Racing Commission asking for a license. The Commission, not Oaklawn, is empowered by law to grant the licenses to owners, trainers and jockeys. Ark. Stat. Ann. § 84-2734(c) (Repl. 1980).

## I. THE FIRST HEARING

On February 8, 1980, a hearing was held before the Commission, all parties being present and represented by counsel. Oaklawn still gave no real reasons for its actions regarding Evans, contending it needed none since it was a private corporation and not a state agency. The Commission granted Evans a temporary license until it could hold a "due process" hearing.

## II. THE SECOND HEARING

A week later, on February 16, another hearing was held with all parties present and represented by counsel. Evans was the only witness. During his testimony he was confronted with a bulletin mailed out November 13, 1979, by the Thoroughbred Racing Association which read:

> Although it took place on a non-TRA track early in October TRPB learned that Gomer Evans, a licensed trainer, who prefers bookmaking to training, was ejected and barred at Louisiana Downs. Evans was not only made to leave personally but his horses were also evicted. The immediate cause of this action was evidence involving a demonstrated bookmaking activity. All tracks should recognize the fact that there is no need to permit or put up with the likes of Evans, especially with strong legal precedence which exists and under which a private race track can deny stalls and/or rejection to premises.

Evans denied any knowledge of the bulletin, and no evidence was offered that he knew of it before the February 16th hearing. Evans contended that he had never been guilty of "bookmaking" and asserted he was not "put off" the Louisiana Downs Race Track or accused of any illegal activity in Louisiana in 1979. He did admit that the security chief at Louisiana Downs had asked him to remove his horses. Evans' testimony reads as follows:

Q. Are you familiar with a Mr. Pernici in Louisiana?

A. I know who the man is.

Q. Is he the director of security at Louisiana Downs?

A. That's who he is.

Q. And did Mr. Pernici ask you to leave the grounds?

A. He asked me to ship my horses.

Q. Did you question Mr. Pernici why he was asking you to leave the track?

A. I did ask him why. He said he would rather not go into it and also said "I can't make you do it."
. . .

Q. When they came to you the next day and asked you to please ship these other six horses did you want to know why?

A. Yes, I did. He said "I don't want to get into it, and if you don't want to we can't make you but we might take other measures if you don't." I didn't want to be there — I heard about those guys

down there and I don't think you could win and stay there if they didn't want you.

Evans removed the horses he had at the Louisiana track; but he contends that the action of the security chief was a request, not an order.

Part of a letter from Richard Pernici to Oaklawn was read into the record. It reads:

After receiving numerous complaints regarding bookmaking activities by Gomer Evans, Sr., at the Louisiana Downs Race Track, surveillance was established by Louisiana Downs security personnel on the subject. Surveillance determined a large number of individuals approaching Evans repeatedly between races giving him verbal information and on a number of occasions Evans was observed making notations on a piece of paper which appeared to be the front of an overnight sheet. Coming on down, following the 7th race on 9/26/79, this writer invited Mr. Evans to the security office at which time he was informed the management wanted him to remove his stock from the grounds as well as himself and conduct his racing at some location other than Louisiana Downs. Mr. Evans departed.

Evans admitted to some suspensions at out-of-state tracks in prior years, but it was concluded that these suspensions caused Evans no problems in Arkansas because he had raced his horses at Oaklawn since those incidents. Evans admitted that he and his friends were watched for "bookmaking" actions at Oaklawn in 1979, but testified that he was never confronted by Oaklawn about bookmaking. That statement was not refuted.

In a statement to the Commission, counsel for Oaklawn said Oaklawn had FBI reports which contained complaints of Evans acting as a "bookmaker." Those reports were not offered as evidence.[1] Oaklawn argued that Evans should

---

[1] Counsel for Oaklawn and Evans discussed the FBI reports and Evans' counsel said he would get the reports and offer them at a later hearing. They were never offered by either counsel.

not be granted a license because of the evidence it had produced. Further, Oaklawn defended its position that it was a private corporation and needed no legal cause for denying Evans access to the track.

Evans argued that (1) Oaklawn had no such absolute right since it was actually an arm of the state and bound to comply with due process of law; (2) Oaklawn had given him no notice or reasons for its action; and (3) Oaklawn had not afforded him a hearing. Evans also argued that the evidence, admittedly hearsay, did not warrant denying him a license and a right to race his horses.

Four commissioners voted to grant Evans a license, one abstained and one voted to deny Evans a license.

During the second hearing Oaklawn informed the Commission it would continue to exclude Evans and immediately after the hearing wrote Evans a letter formally denying him access to the track.[2]

## III. THE THIRD HEARING

Evans appealed again to the Commission and another hearing was held February 23, 1980. This hearing actually was just a presentation of the positions of Evans and Oaklawn.

Evans argued he had been issued a license by the Commission, that this license was a property right, and that this property right was being denied him by the arbitrary action of Oaklawn. Furthermore, Evans argued that the Commis-

---

[2]The letter recited the reasons for excluding Evans were Rules 1124, 1126 and 1128 of the Rules and Regulations Governing Horse Racing in Arkansas. Rule 1124 provides that a person who is ruled off any course or suspended by any thoroughbred horse franchise holder shall be ineligible to start any of his horses in any race until the particular horse has been reinstated either by rescission of the owner's suspension or by the horse's transfer to another owner. 1126 provides that the same is true for any horse under the care, management, training or superintendence of the suspended person, and 1128 states that a suspended person shall not be qualified to run any horse in any race either in his own name or in that of any person until the rescinding of his suspension.

sion had the power to order Oaklawn to let him race.

Oaklawn argued that it had the right, as set forth in its formal letter to Evans, to keep Evans from racing, despite his license. The Commission declined to overrule Oaklawn's decision.

Evans appealed from the Commission's actions, reciting that "The Commission was not authorized by Arkansas law, or rules or regulations to supervise Oaklawn as here sought by Evans."

Generally, the legal issues raised fall into two categories: First, Oaklawn's authority as a private corporation holding a public franchise; next, the legality of the Arkansas State Racing Commission's hearing and decision.

In the first regard two questions must be answered: Did Oaklawn have the right to act as it did in denying Evans access to the track before any hearings were held; did Oaklawn have a right to deny Evans access to its track after he had been granted a license?

The answers to these questions lie, in part, with a determination of whether Oaklawn was acting for the State of Arkansas, or as a private corporation. If Oaklawn was acting for the state, it was bound to give Evans due process under the Fourteenth Amendment to the United States Constitution. That would mean it had to give Evans a hearing at a meaningful time and in a meaningful manner. *Barry* v. *Barchi*, 443 U.S. 55 (1979). It is not disputed that Oaklawn did not give Evans a hearing before it initially denied him access to its track in late 1979. Whether Oaklawn was acting purely as a private business depends upon its relationship with the State of Arkansas.

Oaklawn is a private corporation but it has a public franchise to operate the only thoroughbred race track in Arkansas. Arkansas has extensive regulations concerning the track and derives substantial revenue from the franchise.[3]

---

[3]Ark. Stat. Ann. § 84-2749(c) (Repl. 1980) reads:
The franchise holder shall withhold and pay to the Commission for

In *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345 (1974) the United States Supreme Court dealt with this issue. The case involved a privately owned utility company subject to extensive state regulation. The court conceded that whether action by such a corporation is "private conduct" or "state action" is frequently a difficult one. The mere fact a business is subject to state regulations and those regulations are extensive does not mean that action by a private corporation is state action. Nor would the fact that such a private company held a monopoly be controlling. The test in such cases is whether "there is sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson* v. *Metropolitan Edison Co., id.*, at 351. The court concluded that the utility company was not acting for the state.

The case law is virtually uniform in holding that a private race track can exclude a patron for no reason at all and such action will not be "state action." *Watkins* v. *Oaklawn Jockey Club*, 86 F. Supp. 1006 (W.D. Ark. 1949), aff'd. 183 F. 2d 440 (8th Cir. 1949); *Madden* v. *Queens County Jockey Club*, 296 N.Y. 249, 72 N.E. 2d 697 (1947); *Marrone* v. *Washington Jockey Club*, 227 U.S. 633 (1913). However, the authorities vary when a private corporation, operating a race track, denies a licensee certain rights or privileges that ordinarily go with such a license. Some cases hold that the private corporation is not acting for the state. In *Fulton* v. *Hecht*, 545 F. 2d 540 (5th Cir. 1977) the United States Court of Appeals, Fifth Circuit, affirmed a Florida Supreme Court decision which held that the exclusion of a licensed owner from a private kennel club, regulated by Florida, was not state action. The court found that although Florida extensively regulated the track, licensed the owners, audited the books, received revenue from the track, and had the dogs checked by state veterinarians, the court could not say that the race track's actions should be stamped as those of the state. Also, the court rejected the argument that the race track was an agency of the state simply because the track had a monopoly for one-third of the year.

the use and benefit of the State of Arkansas, as a privilege tax, six percent (6%) of all moneys wagered.
*See* Rules and Regulations of Arkansas Racing Commission.

Similarly, the court in *Martin* v. *Monmouth Park Jockey Club*, 145 F. Supp. 439 (D.N.J. 1956) held that a jockey who was licensed in New Jersey had no right to require a private race track to let him ride. The court said:

> [N]owhere in the statutes or rules governing race tracks is there any indication that simply because he has a license from the New Jersey Racing Commission a jockey thereby possesses a right to ride at any track in the state despite the wishes of its owner . . . .

> Obviously, the fact that he does have to make such engagements imports no guarantee of employment, for jockeys are employed by the owners of the horses and not by the Club. Equally obviously it imports no obligation on the Club to open the premises to all licensed jockeys.

Other jurisdictions have viewed the matter differently in somewhat identical circumstances. For example, *Jacboson* v. *New York Racing Association, Inc.* 41 A.D. 2d 87, 341 N.Y.S. 2d 333 (1974), 33 N.Y. 2d 144, 350 N.Y.S. 2d 639 (1973), 49 A.D. 2d 634, 370 N.Y.S. 2d 640 (1975), the court found that when a privately owned race track denied a licensed owner access to its track it was state action. In *Jacobson* the court based its decision on virtually the same circumstances, i.e. state regulation, receipt of revenue, and so forth, that the Florida Court used to reach the opposite conclusion. There are other cases which seem to be in agreement with the Jacobson decision. *See Fitzgerald* v. *Mountain Laurel Racing, Inc.*, 464 F. Supp. 263 (W.D.Pa. 1979) and *Hubel* v. *Virginia Racing Comm.*, 513 F. 2d 240 (4th Cir. 1975).

We are of the view that Oaklawn's actions in failing to recommend Evans for a license and failing to provide him with stall space before any hearing was held were not state action. Arkansas does not run Oaklawn. While it has laws which permit the extensive regulation of Oaklawn, the state does not dictate to Oaklawn how it will run its track. Oaklawn has a franchise and a license to run its race track. The Commission has the sole authority to license owners, trainers and jockeys, but nowhere in the law or in the

regulations of the Commission is any licensee guaranteed a right to use that license. Whether an owner is granted the right to enter a certain number of races is not the subject of a regulation. Whether an owner is to be given a certain number of stalls at the race track is not the subject of a rule or regulation. Arkansas has decided by the absence of law or regulation to leave the running of the track to the judgment of the franchisee in matters such as the one involving Evans. This does not mean that Oaklawn's actions are not subject to review by the State of Arkansas. They are, as we will point out.

Was Oaklawn's action in denying Evans access to the track, after he had been issued a license, arbitrary and unlawful? The difference between this action and Oaklawn's initial action is that Evans had been granted a license by the State of Arkansas. However, as pointed out in *Fulton* v. *Hecht, supra,* such a license does not give one the right to an unlimited use over the objections of a private race track. No doubt there must be some justification for that action and that justification must be made to the Arkansas Racing Commission. Rule 1256 of Rules and Regulations Governing Horse Racing in Arkansas provides:

> Any persons, firms, association or corporation penalized or disciplined under the Law, or under these Rules, or who is otherwise aggrieved by any action, proceeding or decision of a Racing Official or franchise holder licensed by the Commission, may appeal to the Commission for a review of such action, proceeding or decision by requesting a hearing before the Commission, which may take whatever action it deems appropriate.

Oaklawn's actions were appealed in every instance to the Arkansas Racing Commission, reviewed by the Commission and were not overruled. The rules and regulations of the Racing Commission actually permit Oaklawn to put off individuals from its race track or to suspend the license of an owner or jockey. For example, Rule 1134 provides:

The Stewards may fine, suspend or Rule off any

person who, in their opinion, has acted to the detriment of racing or violated the Rules.

But this action is subject to review by the Racing Commission. Rule 1128 provides:

Each franchise holder shall furnish to the Commission the names and addresses of all persons ejected by the franchise holder from its grounds, together with the offense or offenses alleged against them and any other material information relating thereto.

Oaklawn complied with these rules in that it notified the Commission and Evans after its second hearing that it intended to keep Evans off its track and it cited the rules and regulations upon which it was relying.

It would be a close question whether, under the Arkansas Racing Commission's rules and regulations, Oaklawn had to formally report to the Commission its actions in failing to recommend Evans for a new license or failing to give him stall space. That issue, however, is moot because Evans appealed from Oaklawn's actions and Oaklawn did justify its action to the Racing Commission. Therefore, Oaklawn did not violate any constitutional or legal rights of Evans either before or after the hearings.

Besides the evidence in the case, some consideration must be given to the integrity of the sport iself and in that regard Oaklawn has a duty and responsibility. In *Martin* v. *Monmouth Park Jockey Club, supra,* the court said:

In a sport where the greatest importance should be attached to dissipating any cloud of association with the undesirable, and in which the appearance as well as the fact of complete integrity is a paramount consideration, to exclude Plaintiff from riding because of his record was an understandably warranted exercise of discretion.

There is no doubt this entered into Oaklawn's decision as well as the Commission's final decision.

The remaining question concerns the actions by the Commission. This case comes to us on appeal from a decision of the Racing Commission which is an administrative agency of the State of Arkansas governed by the Administrative Procedure Act. Ark. Stat. Ann. § 5-701 to -715 (Repl. 1976). Evans' argument in this regard is essentially that the Commission's decision not to overrule Oaklawn's actions was arbitrary and not supported by substantial evidence. Additionally, Evans argued that the Commission had the right to overrule Oaklawn and failed to do so. There is no question that the action by the Arkansas Racing Commission was state action and Evans had to be accorded his rights by the Commission according to due process of law. That is precisely what the Commission did. It held not one but three hearings, all of which were attended by Evans and his counsel. Evans was first granted a seasonal or one-year license, and at the final hearing, after reviewing the matter, the Commission decided it should not overrule the judgment of Oaklawn in denying Evans access to its track as an owner.

Refined, the issue becomes: Was the Commission justified as its last hearing in failing to overrule Oaklawn's decision? We conclude that the Commission's decision was supported by substantial evidence and was not arbitrary. The substantial evidence in this case was the testimony of Evans, the bulletin from the Thoroughbred Racing Association, and the letter from the security chief at Louisiana Downs. Evans gave his version of what happened in Louisiana and he concluded that he had not been "put off" the track. The documentary evidence, admittedly hearsay, was to the contrary. Hearsay evidence that normally would be excluded in a trial may be used in a hearing before an administrative agency. Ark. Stat. Ann. § 84-2745 (Repl. 1980). The Commission also had the benefit of Evans's testimony when it made its decision. Our determination is not based on whether we would do the same but whether there was substantial evidence to support the agency's decision. *White County Guaranty S & L* v. *Farmers and Merchants Bank of Des Arc*, 262 Ark. 893, 562 S.W. 2d 582 (1978). We find there was substantial evidence in this case.

Should the Commission have granted Evans the right to

use his license? There is nothing in the Arkansas statutes or the rules of the Racing Commission that states that a licensed owner or jockey has a right to race. The Commission decided not to superimpose its judgment on Oaklawn. The circuit court upheld the Commission but went on to say the law did not permit the Commission to suppress Oaklawn's decision by making Oaklawn let Evans race. In that regard the circuit court was wrong.

The Commission could have ordered Oaklawn to permit Evans to race. On review, we look to the Commission's findings, not the circuit court's. We address the issue of the Commission's authority because it is a point raised on appeal by Evans.

Ark. Stat. Ann. § 84-2734 reads:

[I]t shall be the function, power and/duty of the Commission to:

(f) Take such other action, not inconsistent with the law, as it may deem necessary or desirable to supervise and regulate, and to *effectively control in the public interest*, horse racing in the State of Arkansas [Emphasis added.]

This power is apparently recognized by the Commission because the preamble to the Rules and Regulations promulgated by the Commission reads, in part:

The Racing Commission shall have continuing jurisdiction and control over all penalties and decisions imposed or made by them, or their predecessors, except as otherwise provided by Law. *Furthermore, the Commission shall have the power and authority to review, affirm, modify or rescind any penalty or decision with regard to any infraction of these Rules which may be imposed or made by the racing officials of any Meeting.* [Emphasis added.]

The law clearly gives the Racing Commission the duty to regulate Oaklawn and the authority to carry out that regulation. In this case, the Commission had the right to order Oaklawn to permit Evans to race. The fact that it did

not is not error. The record reflects the Commission deferred to the private corporation's judgment in this matter and we cannot say the Commission's judgment in that regard was arbitrary. It would mean that the Commission would have to decide when Evans could race, how often, how many stalls he could have and so forth — a posture the Commission, no doubt, did not want to take. But it could have done so. The Commission is charged with regulating that track in the public interest and that interest is paramount.

The dissent by Justice Purtle attempts to bring this case within the purview of the equal protection clause. Here there was no claim that Evans' exclusion was based on race, sex, or any other discriminatory criterion. The dissent misses this point, and relies on the case of *Burton* v. *Wilmington Parking Authority*, 365 U.S. 715 (1961), where the appellant was refused services solely because he was black. That case is irrelevant.

In summary, we find that Oaklawn is a private corporation and that its acts in regard to Evans were not state action and, therefore, not subject to due process of law requirements imposed by the Fourteenth Amendment to the United States Constitution. Next, we find that the Arkansas Racing Commission granted Evans his rights as guaranteed by the United States Constitution, the statutes of the State of Arkansas and the rules and regulations adopted by the Commission. Finally, we cannot say that the Commission's actions in failing to overrule Oaklawn's final judgment were arbitrary or not supported by substantial evidence. We disagree with the Commission's original interpretation of its duty and authority but do not find that its action was contrary to law. Consequently, we affirm the Commission's decision and the judgment of the Circuit court. This decision, of course, would not be determinative of the merits of any future application Evans may make.

Affirmed.

GEORGE ROSE SMITH, PURTLE & MAYS, JJ., dissent.

JOHN I. PURTLE, Justice, dissenting. I cannot agree with

the majority when they allow any person to be deprived of due process of law by an entity which is in actual operation an agency of the State of Arkansas. I believe the facts of this case, when considered in their totality, clearly require the decision of the trial court to be reversed both from the standpoint that the action complained of here is an indirect state action and, furthermore, that the appellant held a vested property right which had been taken from him without due process of law.

There would be no pari-mutuel wagering in Arkansas if it were not for Amendment 46 to the Constitution of Arkansas which states:

> Horse racing and pari-mutuel wagering thereon shall be lawful in Hot Springs, Garland County, Arkansas and shall be regulated by the General Assembly.

This amendment, approved by the people of Arkansas, allows pari-mutuel wagering on horse racing in Hot Springs, Garland County, Arkansas, under such regulations as the General Assembly may prescribe. Nothing in the amendment allows the Oaklawn Jockey Club, Inc. to prescribe the conditions for racing in Hot Springs. The legislature saw fit to create the Arkansas Racing Commission and give it certain functions, duties, and responsibilities, as evidenced by Ark. Stat. Ann. § 84-2701 et seq. (Repl. 1980). The Commission in turn has created its own operating rules and regulations.

The Oaklawn Jockey Club, Inc. came into possession of the franchise in this case by operation of Ark. Stat. Ann. § 84-2735 (Repl. 1980) which reads:

> Horse racing may be conducted in all political subdivision of the State of Arkansas in addition to the City of Hot Springs, Garland County, Arkansas, wherein horse racing has been made lawful by Amendment 46 to the Constitution of the State of Arkansas, but only by the holder of a franchise granted by the Commission; and the Commission may grant a franchise only to a corporation organized under the laws of this State. Franchises may not be granted by the Commission to individuals, partnerships, associations, trusts, or to any

others except corporations as in this section provided.
. . .

It can be seen from this statute that the General Assembly has restricted the operation of parti-mutuel wagering to the Oaklawn Jockey Club, Inc. as the "one" selected by the Commission. No other city in Arkansas may be granted a franchise regardless of the language in the statute.

Ark. Stat. Ann. § 84-2742 (Repl. 1980) provides the Commission with full, complete and sole power and authority to promulgate rules, regulations, and orders, and to prescribe conditions under which horse racing shall be conducted by a franchise holder. The statute further states that the authority so granted shall be exercised by the Commission in a reasonable manner and that any person or taxpayer shall have redress to the Pulaski County Circuit Court for any wrong committed by the Commission in the exercise of its authority. This statute provides that the Commission, rather than the franchise holder, has the final authority to determine who shall be the officers, employees, or agents in charge of directly administering the races and handling funds which may be wagered on these races. The Commission is further granted the power to compel the discharge of any employee of the franchise holder who fails or refuses to comply with the orders of the Commission or who is, in the opinion of the Commission, guilty of fraud or dishonesty. The Commission gives the franchise holder 10% of all wagers plus 90% of the gate receipts to operate the track for the state. Ark. Stat. Ann. § 84-2749 and § 2750 (Repl. 1980).

The General Assembly for the State of Arkansas sets the number of days which races may be held during each year. The franchise holder does not even have the right to set the date for the racing meet because this power is reserved to the Commission by the legislature. Ark. Stat. Ann. § 84-2744 (Repl. 1980). The state collects $500 per day from the franchise holder, and, in addition, is given a commission of 6% of all wagering plus 10% of the gate receipts. Ark. Stat. Ann. § 84-2750 (Repl. 1980). The Commission has offices and personnel on the premises; and, they work in harmony with, and supervise, the franchise holder throughout the rac-

ing season. Also, the state sets the license fee for each horse owner, trainer, jockey, and agent who participates at Oaklawn. These fees are paid to the state. Ark. Stat. Ann. § 84-2746 (Repl. 1980).

Another area of cooperation between the state and the franchise holder is the issuance of free passes to the races. Ark. Stat. Ann. § 84-2750 (Repl. 1980). Thousands of season passes and daily passes are issued to the Executive Department for the State of Arkansas and to members of the General Assembly and other elected officials. These passes are then passed on to persons deemed worthy of receiving them by the various grantees of the passes. No doubt, passes are issued to other than state officials, but, nevertheless, a sufficient number are issued to show a considerable interest by the state in the operation of the race track. In any event, it is the Commission which authorizes the thousands of passes to the races.

Horse racing at Oaklawn is an exclusive monopoly under which only the Oaklawn Jockey Club, Inc. is allowed to operate. It is allegedly for the benefit of the people of the State of Arkansas, and certainly, there are no legislative restrictions concerning who may attend the races, as long as they are age 16 or older, pay the entrance fee or are able to obtain a pass. Everyone admits the state could not do what the appellee did in this case. The question is did the state do it indirectly. Despite this monopoly granted by the people of the State of Arkansas, the Oaklawn Jockey Club, Inc. claims the right to exclude any person under any circumstances they deem appropriate. Indeed, they argue they have the authority to exclude a person because he has red hair or false teeth or for any other reason. Certainly they have demonstrated that they intend to exclude any person against whom they have heard a rumor that displeases them. It is obvious that it was the Oaklawn Jockey Club, Inc. that "called the shots" in this case rather than the Racing Commission, which theoretically holds this power. In effect, the Commission exercised its authority in this case through Oaklawn for the purpose of trying to evade the due process rights of appellant.

The franchise holder has certain personnel on its prop-

erty known as "TRA officers." These so called "officers" are empowered by the club to take any person into custody and question them or even "throw them off the track." The state cooperates with these TRA people to the extent that regularly commissioned officers of the state, county and city are on the tracks to assist in these operations. No clearer course of state action could be found than that which is exercised by these people who call themselves "TRA officials." In fact, they are "super" policemen because they have the right to expel a man and his horses from the premises based entirely upon rumor and suspicion. No other such circumstances are allowed to exist anywhere in the State of Arkansas as far as I have been able to determine.

The power which Oaklawn wields is clearly demonstrated in the procedure held by the Commission and the court below. Even though the state licensed the appellant, finding no valid legal reason not to do so, the franchise holder warned the Commission it would do no good to grant the license because they intended to prevent appellant from racing, regardless. Thus, it became Oaklawn that made the decision and overruled the Racing Commission. Oaklawn is clearly exercising state power in circumstances as are present in this case.

As far as the bookmaking activities of the appellant is concerned, it was rank hearsay and did not rise to the dignity of a first-class rumor. Appellant had raced horses at Oaklawn for 25 years prior to this incident. Only the appellant appeared and testified under oath. The TRA officials, who made the allegations in the first place, respectfully declined to appear and undergo cross-examination. Obviously, appellant was never convicted of a crime, which is one of the reasons the Commission could use to refuse to issue him a license. Perhaps the Commission was afraid to disobey the wishes of Oaklawn for fear they would be thrown off the track.

The majority relies heavily upon the opinion in *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345 (1974). Although I disagree with the results in the *Jackson* case, as did several members of the United States Supreme Court, I think it can easily be distinguished on its facts from the case before us.

Perhaps there was not a sufficiently close nexus between the state and the franchise holder to show state action either directly or indirectly. However, the facts in the present case go far beyond those in *Jackson*. There, the state granted the franchise and approved the rates, and there was no further association between the state and franchise holder. In the present case there is a daily supervision by state officials, a daily fee collected, a commission on the wagering, 10% of the gate receipts, and police protection and supervision on the premises. The state has veto power on employees of Oaklawn who run the races and collect the money. There is more state supervision and control at the Oaklawn Jockey Club, Inc. than there is at a Razorback football game. Certainly, no one would argue that a man with red hair or false teeth could be excluded, for that cause, from a Razorback game. A case very close to the present facts is that of *Burton* v. *Wilmington Parking Authority, et al*, 365 U.S. 715 (1961). In *Burton* the appellant was refused services at a public restaurant because he was black. The State of Delaware denied the appellant relief on the theory that there was not sufficient state action to allow standing for Burton to bring his action based upon discrimination in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. In *Burton* the city of Wilmington created an agency known as the Wilmington Parking Authority. The law relied upon in excluding appellant in *Burton* stated that the proprietor of a restaurant may refuse to serve "persons whose reception or entertainment by him would be offensive to the major part of his customers. . . ." The test set out in *Burton* was one of "sifting the facts and weighing the circumstances" in order to determine the nonobvious involvement of the state in private conduct. We must sift the facts and weigh the circumstances and in doing so there is no question in my mind but that there is a sufficiently close nexus between the state and Oaklawn that the action complained of in this matter is clearly state action. If the nexus were any greater, the state would have full and complete control of all activity at the track.

It is impossible to find any type of measuring stick or device which would allow us to determine what amounts to state action except that we must examine all of the facts in

each case. Sometimes it becomes as difficult as tracking a snake across the interstate highway to follow the action of the state through the legislation, the Commission, and the clubs. Here the tracks are very visible all the way from the legislature to the incident in question. In this case it started with state action and ended with the denial of the appellant's continued operation as an owner and trainer of thoroughbreds at Oaklawn. It is the ground between these two points that confuses my brethren. To me it is quite clear that the state is so entwined and engaged in the operation that it has become a joint venture between the state and Oaklawn. The two have become inextricably partners in the operation of the races at Oaklawn, and the state should not now be allowed to wash its hands and stand back as did Pontius Pilate. Ark. Stat. Ann. § 84-2734(f) (Repl. 1980) defines some of the duties of the Racing Commission when it states:

> (f) Take such other action, not inconsistent with the law, as it may deem necessary or desirable to supervise and regulate, and to effectively control in the public interest, horse racing in the State of Arkansas.

Any function granted to the Commission which it delegates to Oaklawn is still state action. The state cannot do indirectly what it cannot do directly. The nexus between the state and Oaklawn could not be greater without throwing the franchise holder off the track.

Up to this point I have primarily dealt with the Fifth and Fourteenth Amendment rights of the citizens of the United States and the State of Arkansas. The Fourteenth Amendment deals with state action which may be either direct or indirect as the foregoing discussion has shown. However, property rights between citizens and/or organizations other than the government had been provided for in Chapter 42 of the United States Code Annotated. For example, 42 U.S.C.A. 1982 states that all citizens of the United States shall have the same right, in every state and territory, as enjoyed by white citizens thereof, to inherit, purchase, lease, sell, hold and convey real and personal property.

42 U.S.C.A. 1981 provides that all persons within the

jurisdiction of the United States shall have the same right to make and enforce contracts and, in general, be entitled to full and equal benefits provided to other citizens.

No doubt, 42 U.S.C.A. 1983 has given rise to more action than any other single statute in the United States. Section 1983 applies to every person who acts under color of law . . . custom or useage of any state subjects citizens to the deprivation of any rights . . . secured by the constitution and laws, shall be liable to the party injured either at law or in equity.

An attempt to deny black persons membership in the Y.M.C.A., because of their color, was declared to be a violation of § 1981. *Smith* v. *Young Men's Christian Ass'n of Montgomery*, 462 F. 2d 634 (5th Cir. 1972). It has been held that the ticket for admission to a place of entertainment is a contract within the provisions of § 1981. Therefore, defendants who denied black persons admission to a place of entertainment were violating the rights of those excluded. *Scott* v. *Young*, 421 F. 2d 143 (4th Cir. 1970), cert. denied 398 U.S. 929. A similar situation was dealt with in *Tillman* v. *Wheatson-Haven Recreation Assn.*, 410 U.S. 431 (1973). A group of people attempted to organize a private club for the purpose of operating a swimming pool. Although the area had a geographical limitation for qualifying for membership, they further attempted to exclude black persons from the swimming pool. The Supreme Court held that this was in violation of § 1982. These laws were passed shortly after the civil war; and, although they lay dormant for many years, they have been used very successfully in recent years. It has long been recognized that an interest in a lawful business in a species of property entitled to the protection of due process. *Goldsmith* v. *Bd. of Tax Appeals*, 270 U.S. 117 (1926); *Greene* v. *McElroy*, 360 U.S. 474 (1959). Such interests may not be viewed as merely a privilege subject to withdrawal or denial at the whim of the state, nor may such interests be dismissed as de minimis. *Frontier Salon, Inc.* v. *Alcoholic Beverage Con. Bd.*, Alaska, 524 P. 2d 657 (1974). Further, the Supreme Court has repeatedly refused to recognize a distinction between privileges and rights in determining the applicability of due process. *Goldberg* v. *Kelly*, 397 U.S. 254 (1970).

Moving to a case very close in point is the one we are now considering, we look at *Barry* v. *Barchi*, 443 U.S. 55 (1979). The United States Supreme Court held that a licensed trainer, whose license was suspended for a bad test on one of his horses, had a property interest in the license under state law sufficient to invoke the due process protection. The Court stated:

> ... as a threshold matter, therefore, it is clear that Barchi had a property interest in his license sufficient to invoke the protection of the due process clause. ...

There is no room for reasonable doubt that the action in the present case was actually state action. Although the Racing Commission obviously shirked its duty and allowed Oaklawn to act in its stead, the action is, nevertheless, still state action. It would serve no useful purpose to list countless cases which hold that a license, particularly involving livelihood, requires procedural due process as well as a reasonable justification and a meaningful and timely hearing prior to suspension of said license. *Franklin* v. *State*, 267 Ark. 311, 590 S.W. 2d 28 (1979); *Jacobson* v. *New York Racing Association, Inc.*, 341 N.Y.S. 2d 333 (1973). The Supreme Court reached a result in *Jacobson* contrary to the majority in the present case. In that case a licensed owner and trainer of thoroughbreds brought suit when the franchise holder refused to allot him any stalls following a 45-day suspension. He had been allotted stall spaces for 20 years prior to the suspension. The franchise holder refused to allow stalls to the trainer-owner on the ground that his character was not approved "as being sufficiently good to have him racing" at the corporation's tracks. The Supreme Court of New York held an owner and trainer of thoroughbreds cannot be deprived of a facility, previously granted to him, by an arbitrary refusal of the entity franchise to conduct thoroughbred races with pari-mutuel betting. The Court held that the requirements of due process must be met whenever the state has so far insinuated itself into a position of interdependence that it must be recognized as a joint participant in the challenged activity.

In *Jacobson* v. *New York Racing Association, Inc.*, supra, the Court held that the franchise holder has a monopoly, except

for one track, in the State of New York, and that its refusal to provide stable space prevented the owner from pursuing his livelihood as an owner and trainer of thoroughbred horses. The Court pointed out that the Racing Commission was the sole authority entitled to pass on the character of persons engaged in racing. The Court further stated:

> We think that the close regulation of the appellant (franchise holder) by the Racing Commission, the delegation to appellant of the conduct of pari-mutuel betting, and control over the affairs of the appellant exercisable by the Racing Commission are strong evidence of state involvement. In this context the franchise granted by the state, the franchise fee consisting of the taxable income of the appellant subject to stipulated deductions, and the disposition of the assets of the appellant to "exempt" organizations designated by the Governor on its disillusion becomes highly significant. . . .

Certainly, there is more involvement by the state in Oaklawn than was shown in *Jacobson* v. *New York Racing Association, Inc.*, supra. When the state moves into private sector, it brings with it its burdens as well as its benefits. A franchise to conduct horse racing did not exist in common law and exists here solely upon the authority of the state through Amendment 46 to the Constitution. The Oaklawn Jockey Club, Inc. had no right prior to Amendment 46 to conduct races anywhere in Arkansas. It derives its every fiber through the action of the state. Many cases have held wherever the state or federal government becomes so involved in what would be otherwise private business that such activities become those of the government. *Simkins* v. *Moses H. Cone Memorial Hospital*, 323 F. 2d 959 (4th Cir. 1963); *Smith* v. *Holiday Inns of America, Inc.*, 336 F. 2d 630 (6th Cir. 1964); *Saratoga H.R.A.* v. *Agric & N.Y.S.H.B.D.F.*, 291 N.Y.S. 2d 335 (1968).

No doubt, the legislature and the Racing Commission had in mind the public interest of the people of the State of Arkansas when they set up the controls and regulations governing horse racing and pari-mutuel wagering. Surely, they realized there was a danger in allowing a franchise

holder to refuse to allow any owner, trainer, jockey, or agent to participate in the races for no reason at all. This, no doubt, is why the Racing Commission kept to itself the authority to license these people and to collect the fee for the license. The Commission believed that a franchise holder could prevent certain persons and horses from appearing at Oaklawn in a manner which would result in the franchise controlling the results of the races. If by some chance only a selected few owners and trainers were allowed to race, results might be very nearly determined in advance of the races. Also, those who reside in Arkansas and earn their livelihood in the state might well be denied the right to earn a living in Arkansas upon the arbitrary whim or caprice of the franchise holder. It would appear that if the franchise holder were allowed to exclude all patrons from the premises who are not acceptable to the franchise holder, the results could be a selected audience which comports to the views of the franchise holder. Not only would this likely result in discrimination but could also result in the loss of money to the State of Arkansas. I would not under any circumstances argue that the operator of the track would have to tolerate any person creating a public disturbance or otherwise violating the law while on the track.

The Oaklawn Jockey Club, Inc. is an Arkansas corporation organized for the sole purpose of operating the racing and pari-mutuel wagering at Hot Springs. As far as the record reveals, there is no membership roster, and no one pays any dues to the club. It is obvious that this club is not a private club within the ordinary meaning of the word. In fact, it is perhaps the most public club in Arkansas. Shortly before and during the racing meet, the advertising media carries a heavy load of advertisement directed at the public in attempting to get the public to attend the races at Oaklawn. To say that it is not a public organization is to defy logic.

Appellant does not claim he was thrown off the track because of race, sex, or other discriminatory criterion. He claims he was deprived of property and liberty without due process of law which is applicable to every citizen of America, on paper at least. The majority obviously is overlooking the fact that the state is the actual operator of this facility, and whatever Oaklawn does is done as an arm of the Racing Commission. Oaklawn is in error when it claims the right in

Arkansas "to act concerning patrons or patrons who may be licensees without regard to due process standards, prehearing or posthearing."

The appellant had been training and racing horses at Oaklawn for 25 consecutive years prior to this incident. He also races in many other states. His investments in racing horses, primarily in Arkansas, exceed a million dollars. His very livelihood is at stake. He can never race again at Oaklawn, or any other track, nor can any of his horses be raced, unless this action is reversed. Obviously, the Commission is not going to order reinstatement as it has ducked its responsibility on previous occasions. Firmly believing that no person should be deprived of life, liberty, or property without due process of law, I would reverse this case with directions to the Racing Commission to order Oaklawn Jockey Club, Inc. to reinstate the appellant, and his horses, to racing status at Oaklawn Park. I am sorry that my brethen have failed to recognize the rights guaranteed to all Americans.

RICHARD L. MAYS, Justice, dissenting. After determining that it had no obligation to review Oaklawn Jockey Club's decision to exclude a license thoroughbred horse owner and trainer from Oaklawn's horse racing track, the Arkansas Racing Commission dismissed Gomer Evans' appeal without further comment. The circuit court sustained the commission's action, holding that the commission had no statutory authority to review such a decision. Today, without reversing, although holding contrary to both decisions below on the law, the majority sustains Oaklawn's exclusion of Gomer Evans from the race track solely on the basis of hearsay evidence. While holding that state law, not the 14th Amendment, requires the Arkansas Racing Commission to scrutinize Oaklawn's actions, the majority approves of conduct which the racing commission admittedly has not reviewed on the basis of a record which the commission had earlier held did not even justify denying Evans his racing license. In the name of "substantial evidence," none of which could be cross-examined or even sworn to, the majority sustains a decision of the commission which was never made, *i.e.* — that Oaklawn's exclusion of Evans was not arbitrary. I respectfully must dissent.

At the very least, this case has to be sent back to the commission for proceedings consistent with the majority opinion. It is not moot because Evans contends that he can never race anywhere until his Oaklawn exclusion is rescinded. Although no testimony was taken by the commission, Evans' attorney introduced the record of a previous hearing before the commission concerning the licensing of Gomer Evans to provide a record for the commission to evaluate his current complaint. The commission refused to consider any evidence, however, since the question before it, as articulated by the commission's attorney was "whether or not you [the commissioners] want to recognizes the right to the track to eject a person for whatever reason they feel necessary." The commission promptly answered the question in the affirmative and adjourned without reviewing the merits of Evans' contention. Since the majority holds that the commission has both the authority and duty to review such decisions by Oaklawn, the Commission could not turn its back on Gomer Evans and refuse to hear his complaint against Oaklawn. Moreover, Oaklawn should also be given an opportunity to justify the exclusion of Evans with competent and persuasive evidence.

If the case is not remanded, Oaklawn's exclusion of Evans cannot be sustained on the record before us. Oaklawn justifies its exclusion of Evans on the basis that he was engaging in bookmaking. The only evidence in the record to support the bookmaking allegation is a Thoroughbred Racing Association newsletter indicating that Evans was barred from Louisiana Downs for bookmaking, a letter from a Louisiana Downs security official which indicates that Evans was asked to leave because he was suspected of bookmaking and alleged FBI reports which purportedly contained complaints about Evans' activities. To rebut the allegation of bookmaking, Evans testified under oath that he had not engaged in bookmaking and that, although he was asked to leave Louisiana Downs, he had not been barred from the race track.

In reviewing a record for substantial evidence, we consider the entire record rather than only the evidence which would support the administrative finding. *Baxter* v. *Board of Dental Examiners*, 269 Ark. 67, 598 S.W. 2d 412 (1980).

Although hearsay evidence is admissible in administrative proceedings, we have never held that mere uncorroborated hearsay or rumor constitutes substantial evidence which would support an administrative determination. It should be especially difficult to do so in this case when the only competent evidence in the record directly rebuts the hearsay and our test of substantial evidence requires evidence of sufficient force and character to compel a conclusion with reasonable and material certainty. *Jones* v. *State*, 269 Ark. 119, 598 S.W. 2d 748 (1980). The only conclusion which can be drawn from the evidence in this record is that Evans is "suspected" of bookmaking. Mere suspicion, the sources of which cannot even be cross-examined, can hardly be described as substantial evidence.

The judgment below should be reversed.

GEORGE ROSE SMITH, J., joins in this dissent.