SCHOOL COMMITTEE OF WELLESLEY *vs.* LABOR RELATIONS COMMISSION.

Suffolk. March 8, 1978. — July 28, 1978.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*School and School Committee. Administrative Agency*, Interpretation of statute. *Statute*, Construction. *Words*, "Managerial employees."

The Labor Relations Commission did not err in finding that employees in a bargaining unit consisting of school principals, assistant principals, directors, coordinators, and department heads did not "participate to a substantial degree in formulating or determining policy" within the meaning of G. L. c. 150E, § 1 (*a*). [116–121]

A finding by the Labor Relations Commission that employees in a bargaining unit consisting of school principals, assistant principals, directors, coordinators, and department heads did not "assist to a substantial degree in the preparation for or the conduct of collective bargaining on behalf of a public employer," within the meaning of G. L. c. 150E, § 1 (*b*), was supported by substantial evidence. [122–123]

A finding by the Labor Relations Commission that secondary school
principals in a school system did not have a "substantial responsi-
bility involving the exercise of independent judgment of an appel-
late responsibility not initially in effect in the administration of a
collective bargaining agreement or in personnel administration,"
within meaning of G. L. c. 150E, § 1 (c), was supported by substan-
tial evidence. [123–126]

The Labor Relations Commission did not err in its resort to legislative
history as an aid to determining the meaning of "managerial em-
ployees" as used in G. L. c. 150E where the meaning of the statute
was neither clear nor unambiguous. [126–127]

Two CIVIL ACTIONS commenced in the Superior Court
on May 7, 1975, and May 29, 1975, respectively.

The cases were heard by *Bennett, J.*

The Supreme Judicial Court granted a request for di-
rect appellate review.

*James M. Paulson* for the School Committee of Welles-
ley.

*David F. Grunebaum* for the Labor Relations Commis-
sion.

*Mark G. Kaplan* for the Wellesley Teachers Associa-
tion, intervener.

ABRAMS, J. By its appeal the school committee of
Wellesley (school committee) challenges the correctness
of a judgment which affirmed an order and decision of the
Labor Relations Commission (commission). The school
committee argues that the commission and therefore the
court erred as matter of law in determining that the term
"managerial employees" as used in G. L. c. 150E did not
exclude from statutory coverage a bargaining unit, unit
B, consisting of "[a]ll Principals, Assistant Principals, Di-
rectors, Coordinators and Department Heads, and no oth-
er professional or non-professional employees of the
Wellesley Public Schools."[1] We affirm the judgment and
order entered by the Superior Court.

---

[1] The commission found that unit B included "thirty eight individu-
als: one senior high school principal; one junior high school principal;
two assistant principals, senior high school; two assistant principals,
junior high school; thirteen department heads; nine elementary prin-
cipals; two guidance directors; two physical education directors; two

We summarize the proceedings. For a number of years, the school committee had recognized the Wellesley Teachers Association (association) as the exclusive representative of the unit B employees for the purposes of collective bargaining. After the effective date of G. L. c. 150E, the school committee sought a determination by the commission that all unit B employees were now precluded from collective bargaining on the ground that unit B employees were "managerial" or "confidential"[2] employees and therefore not entitled to the collective bargaining rights afforded other public employees by G. L. c. 150E. The association filed a complaint of prohibited practice with the commission alleging that the school committee had refused to bargain collectively in good faith with the association as exclusive representative of the unit B employees.[3] After investigation, pursuant to G. L. c. 150E, § 11, the commission issued an interim order on July 16, 1974, consolidating the school committee's petition with the association's complaint, ordering an expedited hearing on the consolidated cases, and directing the parties to bargain in good faith pending resolution of the dispute.[4]

_____

art directors; one director of library services; a music director; one elementary curriculum coordinator; and one staff development coordinator."

[2] In its brief before this court the school committee has not argued that the members of unit B are "confidential" employees. Thus this argument is deemed waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[3] General Laws c. 150E, § 10 (a), inserted by St. 1973, c. 1078, § 2, provides in part: "It shall be a prohibited practice for a public employer or its designated representative to: (1) Interfere, restrain, or coerce any employee in the exercise of any right guaranteed under this chapter; ... (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section six."

[4] In response to the interim order, the school committee advised the commission, by letter dated July 19, 1974, that it would bargain in good faith with the association concerning wages, hours, and terms and conditions of employment of the unit B employees pending resolution of the consolidated cases. The bargaining was undertaken without prejudice to the rights or claims of the school committee.

After extensive hearings, the commission filed a lengthy and detailed decision in which it determined that none of the unit B employees were managerial or confidential employees within the meaning of the statute and concluded that the school committee's refusal to bargain had been unjustified and in violation of G. L. c. 150E, § 10 (a) (1), and § 10 (a) (5). However, the commission found that the school committee had not acted in bad faith.[5] The school committee's complaint was dismissed.

In the Superior Court the commission sought enforcement of its order against the school committee. The school committee filed a complaint seeking judicial review of the commission's decision. See G. L. c. 30A, § 14 (7). The cases were consolidated, and the association, through its officers, was permitted to intervene. Cross-motions for summary judgment were filed, and a judge of the Superior Court allowed the commission's motion, denied the school committee's motion, and entered a judgment affirming the commission's decision and order in its entirety, including an order that the school committee bargain collectively in good faith with the association. The school committee timely filed its claim of appeal, and we granted direct appellate review.

The issues before the court concern the interpretation of the phrase "managerial" employee in G. L. c. 150E, § 1.[6] The school committee alleges that the commission

---

[5] The commission noted that the school committee and the association had bargained under the terms of the interim order and had reached an agreement, subject only to the proviso "that it would not be applicable to any administrator ultimately found to be excluded from coverage under the Act as a managerial or confidential employee."

[6] General Laws c. 150E, § 1, as amended by St. 1974, c. 354, provides the following definition of managerial employees: "Employees shall be designated as managerial employees only if they (a) participate to a substantial degree in formulating or determining policy, or (b) assist to a substantial degree in the preparation for or the conduct of collective bargaining on behalf of a public employer, or (c) have a substan-

erred in its determination that the unit B employees were not managerial employees as matter of law and statutory interpretation.

We agree with the school committee that "[t]he duty of statutory interpretation is for the courts." *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 344 (1964). We have, however, also recognized that an administrative interpretation of a statute is accorded deference particularly "where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute." *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977), quoting from *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 442 (1972). We turn to the statute, its interpretation, and its application by the commission in its decision.

1. *Substantial Participation in Formulating Policy.*

General Laws c. 150E, § 1, in pertinent part reads: "[E]mployees shall be designated as managerial employees only if they (a) participate to a substantial degree in formulating or determining policy . . . ." In its decision the commission defined policy decisions as "those of major importance when examined in the light of the objective of the public enterprise"; further, policy decisions "must impact a significant part of the public enterprise." In defining substantial participation, the commission excluded participation which is little more than advisory: "Limited participation in the process by which true managerial decisions are made is likewise insufficient to make an employee 'managerial.' . . . [P]articipation . . . [w]hich is only advisory in nature [is insufficient]."

These guidelines for denoting the sphere of substantial participation in formulating policy are in accord with the legislative purpose reflected in c. 150E. This purpose, which is most clearly evidenced by the amendment of the

---

tial responsibility involving the exercise of independent judgment of an appellate responsibility not initially in effect in the administration of a collective bargaining agreement or in personnel administration."

definition of "managerial" to add the phrase "to a substantial degree," is to include as managerial employees only those with significant responsibility in the decision-making process.

The school committee does not quarrel with the commission's definitions of these terms. Rather, it argues that the commission's application of the statutory standard indicates an erroneous interpretation of the provision and that some of the commission's findings were not supported by substantial evidence. Specifically, the school committee contends (1) that the commission's decision read the word "participate" out of the statute, (2) that it improperly required a managerial employee to possess systemwide authority, (3) that it failed properly to consider the functions of two employee committees—the executive council and the elementary principals group—in the formulation of policy, and (4) that it improperly based its definition of the word "policy" on decisions of New York's Public Employment Relations Board.

(a) *Substantial participation.* Quoting a number of excerpts from the commission's decision, the school committee first maintains that the commission's application of the statutory standard required that employees have the authority to make decisions in order for them to be considered managerial. It contends that this test is more stringent than requiring participation in the decision-making process and effectively reads "participate" out of the statute. We conclude, however, that the commission did not overlook the obvious meaning of "participate" and did not contort its meaning to achieve an unusually restrictive interpretation of the statutory passage. Rather, our reading of the commission's decision convinces us that it concluded that any participation by the unit B employees in formulating or determining policy was not "substantial" and thus did not fall within the subsection (a) definition of managerial employees.

The commission found that for participation to be substantial it must be more than advisory in nature. The

factual findings which supported the commission's deter-
mination that any participation in policy formulation by
the unit B members was merely advisory included the
following: some unit B members attended and participat-
ed in periodic discussions with higher administrators;
these meetings were generally characterized as merely
"source[s] of 'input' "; and some unit B members were
consulted, in the capacity of potential implementers of
policy, before a policy was determined. The commission's
reliance on these findings in reaching its conclusion indi-
cates that it was, in fact, principally concerned with
whether the unit B employees functioned in an advisory,
or consulting, role and not with whether they in fact had
the authority to make final decisions. We cannot con-
clude on this record that the commission applied a stan-
dard requiring actual decision-making authority by the
unit B employees.[7]

(b) *The issue of systemwide authority.* The school com-
mittee contends that the commission arbitrarily applied
a standard requiring an employee to possess systemwide
authority in order for the employee to be found to partici-
pate to a substantial degree in formulating policy. The
commission specifically rejected a systemwide authority
test: "Although we do not necessarily believe that the

---

[7] The school committee suggests that the commission's supposed
application of the more stringent test could be explained by its "heavy
but erroneous reliance on decisions of New York's Public Employment
Relations Board interpreting the managerial exclusion in the Taylor
Act [N.Y. Civ. Serv. Law § 201(7) (McKinney 1973)], which reads in
part: 'Employees may be designated as managerial only if they are
persons (i) who formulate policy ....' " The commission did refer to
the Taylor Act, and, in fact, quoted the above passage in the course of
outlining the history behind the adoption of c. 150E, § 1, in its final
form. We think that the commission's explicit reference to the New
York law, particularly in the context of recounting the changes and
compromises undertaken by opposing political forces in the develop-
ment of the Massachusetts version, reinforces, rather than under-
mines, our conclusion that the commission was well aware of the
implications of the words "participate" and "substantial" as they now
appear in subsection (*a*).

authority of a managerial employee must be systemwide (such an interpretation in state government would lead to untenable results) the scope of discretion should be significant when considered in relation to the mission of the public enterprise." Nowhere in its decision did the commission conclude that the failure to possess system-wide authority prevented a unit B employee from being classified as managerial. We thus cannot conclude that the commission did not mean what it said or that it was inconsistent in its application of the standard which it had chosen.

(c) *The functions of the executive council and the elementary principals group.* On the issue whether unit B members substantially participated in the formulation of policy, evidence was introduced concerning the functioning of two employee committees—the executive council and the elementary principals group. The executive council consisted of administrative officials, the two secondary principals, and two elementary principals; it met regularly under the chairmanship of the superintendent. The elementary principals group met regularly with the superintendent. The commission found that these committees functioned merely as sounding boards, as "source[s] of 'input'" and that they had no specific or substantial policy-formulating function.[8] Based on this finding of lim-

---

[8] The commission described the role of the two committees as follows: "The Superintendent meets regularly with two committees which discuss current matters of concern within the school system. The 'Executive Council' is composed of the secondary principals, two elementary principals who serve on a rotating basis, and the Assistant and Associate Superintendents. Discussions by this group might cover any topic from the building of a second high school to examination policies and attendance practices. The meetings are free-wheeling, with a rough agenda prepared by the Superintendent, who chairs the meetings. The council has no specific authority, and does not decide anything. It functions as a sounding board and a source of 'input.' Similarly, the elementary principals, coordinators and directors meet with the Superintendent on a regular basis. As with the Executive Council, their role is loosely defined. Discussions may be wide ranging and deal with important issues, but the group has no decision-making authority *per se.*"

ited advisory "input," the commission concluded that the participation of some unit B members on these committees was insufficient to render these employees managerial.

The school committee contends that the commission's finding that these committees served only as "source[s] of 'input' " was not supported by substantial evidence. The fact that there was some evidence to the contrary[9] does not warrant a conclusion that the agency's findings were not supported by substantial evidence. A review of the record as a whole discloses substantial evidence to support the commission's finding.[10] It is for the agency, not the courts, to weigh the credibility of witnesses and resolve factual disputes. "A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Labor Relations Comm'n* v. *University Hosp., Inc.*, 359 Mass. 516, 521 (1971).

---

[9] For example, the superintendent testified that the executive council and other groups including unit B employees helped, or were instrumental, in formulating policies on class size, educational philosophy, and other issues. These policies were often adopted by the school committee without change. The superintendent also testified that a key role of the executive council was to assist in the formulation of policies to be presented to the school committee.

[10] One of the elementary principals, who had served on the executive council, testified to the effect that the major discussions which took place at the executive council meetings were primarily devoted to obtaining the members' suggestions for implementing decisions which had been or would be made by the school committee. He also testified that the meetings of the elementary principals served primarily as vehicles for the administrators to impart information to the principals and to obtain their suggestions concerning the implementation of decisions which had been previously made. This testimony, together with other evidence before the commission, particularly that concerning a comparison of the responsibilities of unit B members and the superintendent's staff and that indicating that the input of non-unit B members was often similar to that of unit B members, was sufficient to support the commission's findings.

(d) *Improper reliance on New York's Public Employ- ment Relations Board's decisions.* The school committee claims that the commission's construction of the word "policy" in c. 150E, § 1 (*a*), was improperly based on deci- sions of New York's Public Employment Relations Board (PERB). It is clear that the relevant New York statute, the Taylor Act, N.Y. Civ. Serv. Law § 201(7) (McKinney 1973), differs in material respects from the similarly worded Massachusetts provision. We agree with the school committee that indiscriminate reliance by the commission on the New York statute, as construed and applied by PERB, might well result in an improper inter- pretation of the Massachusetts law. We find no reason to believe, however, that the commission was unwittingly misled by the New York decisions, that its judgment was warped by knowledge of or reference to such decisions, or that it deliberately overlooked any relevant differences in the two underlying statutory schemes.

To the contrary, a reading of the commission's decision reveals a careful and discriminating attempt to draw on available resources for the insight they provide in decid- ing these issues of first impression. The commission care- fully analyzed relevant PERB decisions, noted some of the differences between the Massachusetts and the New York statutes, developed a general concept of "policy," and applied this concept, which it determined was in ac- cord with the legislative intent in enacting G. L. c. 150E, to the facts of this case. Moreover, the commission consid- ered not only the New York statute and decisions but also those of other jurisdictions.[11] We find no error.

---

[11] The school committee also argues that the commission's applica- tion of its definition of "policy" was arbitrary in the light of its opinion in *Masconomet Regional School Dist. & Masconomet Teachers Ass'n,* 3 M.L.C 1034 (July 15, 1976), and that the result in the present case was inconsistent with that reached in *Masconomet.* The facts in *Mas- conomet* were quite different from those in the present case and the commission explicitly distinguished this case in its *Masconomet* opin- ion. In these circumstances we cannot conclude that the commission's application of its standard in the present case was arbitrary or that the results of the cases were inconsistent.

2. *Substantial Assistance in Conducting Collective Bargaining.*

Employees are also classified as managerial if they "(b) assist to a substantial degree in the preparation for or the conduct of collective bargaining on behalf of a public employer." The commission found that one elementary principal, a member of unit B, participated in the negotiation of the educational secretaries' contract to the extent of attending one meeting. It also found that unit B administrators are occasionally asked their opinion on possible problem areas in the administration of the teachers' or the secretaries' agreement. With the exception of the one-time attendance by the elementary principal, however, no members of unit B have participated directly in bargaining with any of the other bargaining units with whom the school committee negotiates contracts. On the basis of these findings, the commission concluded that the members of unit B did not participate to a substantial degree in the conduct of collective bargaining.

The school committee, while not directly challenging these findings or this conclusion, argues that there was evidence in the record disclosing instances in which conflicts of loyalty between a unit B employee's duty to his employer and the exercise of his collective bargaining rights resulted in an adverse impact on the efficient operation of the Wellesley school system.[12] The school committee therefore attacks the commission's contrary conclusion as unsupported by substantial evidence.

The instances relied on by the school committee consisted of the testimony by the superintendent that both he and the school committee desired that unit B em-

---

[12] To the extent that this argument might be construed as directly challenging the findings and conclusions of the commission, there was substantial evidence in the record to support the commission's findings, and these findings warranted the commission's conclusion.

ployees participate on the school committee's bargaining team when that team negotiates with the teachers and the fact that two unit B administrators refused to participate in contract negotiations with the secretaries. The significance of these instances in assessing whether the unit B employees are managerial depends on the assumption that unit B administrators might in the future participate to a greater degree in the conduct of collective bargaining. Speculation concerning the future participation of employees is not a sufficient ground on which to base a conclusion concerning the present status of the unit B employees.[13]

3. *Substantial Responsibility in Administering Agreement.*

Under G. L. c. 150E, § 1, employees are also classified as managerial if they "(c) have a substantial responsibility involving the exercise of independent judgment of an appellate responsibility not initially in effect in the administration of a collective bargaining agreement or in personnel administration." The commission interpreted the principal words in this definition as follows: "If the judgment is considered to be 'independent' it must lie within the discretion of the employee to make . . . . It is clear that an individual who functions for management at the first step in a grievance procedure may not be considered to be exercising 'appellate' authority. . . . [W]e must [also] bear in mind the substantiality requirement. The responsibility of an individual must be important. There must be some impact and significance to the judgment. If it is perfunctory, clerical, routine, or automatic, it may not be considered a 'substantial responsibility.' " These approaches to interpreting the statutory phrases are in accordance with the wording of the statute and the

---

[13] Moreover, even if the instances cited by the school committee are viewed as evidencing conflicts or adverse impacts, they would not warrant rejecting the commission's conclusion that, on the whole, the existing collective bargaining structure did not result in untoward difficulties. There was ample evidence to support such a conclusion.

legislative purpose in excluding managerial employees from the coverage of G. L. c. 150E. The school committee does not challenge their correctness.

The only unit B members whose classifications are still in dispute under the appellate responsibility standard are the secondary principals.[14] The commission found that a grievance by a secondary teacher would first be filed with the employee's supervisor—his department head, director, or coordinator. If the grievance was not resolved it would be referred to the secondary principal. Above the principal in the grievance process for secondary teachers are the superintendent, the school committee, and arbitration.[15]

However, in the cases of the only two grievances ever to arise under the contract, the commission found that the secondary principal had no authority to adjust the grievance and that the principal thus served merely as a conduit for the processing of the grievance. The commission determined that the statutory standard must be applied to the actual duties of the employees involved and therefore concluded that the secondary principals did not have substantial appellate authority. Further, the commission found that the department heads, who serve as the first level in the secondary school grievance process, viewed their role in the procedure as perfunctory. Thus, the commission concluded that the exercise of authority by the secondary principals in the context of the grievance process was, as a practical matter, initial, not appellate. These findings, contrary to the school committee's contention, were supported by substantial evidence.[16]

---

[14] At the hearings, evidence was introduced concerning staff evaluations performed by unit B members. The commission concluded that such evaluations did not carry substantial responsibility and were not appellate in nature. The school committee does not challenge these determinations in this court.

[15] In the elementary schools, a grievance is first filed with the principal. If it remains unresolved, it is referred to the superintendent.

[16] The finding that the principals did not possess authority to resolve the grievances is supported by testimony of the superintendent to the

The school committee primarily contends that the commission erroneously applied the statutory definition only to the authority *actually* exercised by the employees; it argues that the proper test is to inquire into the range of *potential* responsibilities of employees. We think the school committee correct in its assertion that application of the statute requires analysis of potential authority, that is, the existence of authority, as well as evaluation of authority which has been exercised. See *Ohio Power Co. v. NLRB*, 176 F.2d 385 (6th Cir.), cert. denied, 338 U.S. 899 (1949). We disagree, however, with the school committee's contention that the commission failed to consider authority possessed and not actually exercised by the secondary principals.

The commission's findings of fact, particularly those concerning the lack of authority of the principals to resolve the two grievances which arose during the contract and the view held by the department heads that their role was a perfunctory one, strongly indicate that the commission was concerned with whether or not the principals possessed authority and responsibility and not just with whether they actually exercised authority.

The school committee points to the fact that the commission in its decision used the words "actual duties." This reference to "actual" duties was not used to the exclusion of potential responsibilities of the principals. Rather, the term was used by the commission in the context of its declining to consider hypothetical situations suggested by the school committee in which a principal

---

effect that they had no such authority. The finding that the department heads viewed their role as perfunctory was supported by the testimony of a witness, who was the chairman of the association's grievance committee and a department head in a secondary school. He stated that once a grievance proceeds beyond the verbal complaint stage, the department head would merely take note of the formal grievance and pass it on to the secondary school principal. It was his belief that secondary-level supervisors did not have the authority to resolve formal grievances.

might have the authority to resolve the grievance. The factual findings and the context of the reference to actual duties indicate that the commission was drawing a distinction not between actual and potential responsibilities but between actual and potential responsibilities on the one hand and speculative authority on the other. We think that a line drawn short of hypothetical or conjectural responsibilities accommodates the practical legislative purpose of separating employees with appellate bargaining responsibilities from the employees entitled to exercise collective bargaining rights.[17]

4. *Use of Legislative History.*

The school committee contends that the commission erred as matter of law by its resort to legislative history and by its choice of legislative materials to evaluate. "In interpreting ambiguous legislation, courts may look to the legislative history, including the Governor's message, as an aid in arriving at a proper construction of the statute." *Boston* v. *Massachusetts Bay Transp. Auth.*, 373 Mass. 819, 826 n.9 (1977). We perceive no reason which would warrant us in concluding that an administrative agency charged with enforcement of a statute could not resort to legislative history in cases where, as here, the meaning of the governing statute is neither clear nor unambiguous.

We do not think it necessary to discuss specifically the various materials referred to by the commission. On the whole, the inquiry was accurately and carefully conducted and disclosed an appreciation of the general policy

---

[17] The interpretation and application of the term "managerial employees" in this decision is based entirely on an evaluation of G. L. c. 150E. The determination that the employees involved in this case are not "managerial" within the meaning of G. L. c. 150E, § 1, does not depart from and is not inconsistent with language in other of our decisions to the effect that principals possess "management" duties. See *Glennon* v. *School Comm. of Boston,* 375 Mass. 757, 765-766 (1978); *Berkshire Hills Regional School Dist. Comm.* v. *Berkshire Hills Educ. Ass'n,* 375 Mass. 522, 526-527 (1978); *School Comm. of W. Springfield* v. *Korbut,* 373 Mass. 788, 795 (1977).

considerations underlying adoption of the original statutory language and of amendments thereto. The commission placed no undue reliance on the legislative history, but used it instead as one of many tools in interpreting the statutory provision.

In summary, we conclude that the commission's decision contained no errors of law, was supported by substantial evidence, and was not arbitrary or capricious. We affirm the judgment of the Superior Court affirming the commission's decision and order in its entirety and ordering the school committee to bargain collectively in good faith.

*So ordered.*