PATRICK CATRONE vs. STATE RACING COMMISSION
& another.[1]

Suffolk. January 5, 1984. — February 8, 1984.

Present: GRANT, CUTTER & SMITH, JJ.

*Racing. State Racing Commission. Administrative Law, Judicial review.*

In an action by a licensed horse trainer for judicial review of a decision by
the State Racing Commission the judge erred by purporting to make
findings of fact as if the proceeding before him constituted a trial de
novo. [486]

A racetrack licensed to operate in the Commonwealth in accordance
with the provisions of G. L. c. 128A may exclude persons licensed by
the State Racing Commission from participation in racing activity in
the exercise of a reasonable business judgment. [486-489]

The State Racing Commission had jurisdiction under G. L. c. 128A, and
the regulations promulgated under that chapter, to consider the ap-
peal of a licensed horse trainer from the refusal of a board of stewards
to order a racetrack to allow his participation in racing at the track.
[489-490]

Findings by the State Racing Commission that a racetrack's exclusion of a
licensed horse trainer from participation in racing activity because of
his past conduct and associations or for reasons in the interest of racing
was a reasonable discretionary business judgment, and was not arbi-
trary, were supported by evidence that the reputation of the racetrack
had declined; that the racetrack was seeking to restore public confi-
dence in its racing; and that the trainer had an unfavorable reputation
which, although insufficient to sustain disciplinary proceedings by the
commission for particular misconduct, could be thought to have been
detrimental to good racing standards. [490-492]

A licensed racetrack's decision to exclude a horse trainer from participa-
tion in its racing activity was predicated upon the rights of the race-
track, as a private corporation, to act upon its reasonable business
judgment and did not amount to State action. [492-493]

CIVIL ACTION commenced in the Superior Court Depart-
ment on May 28, 1982.

---

[1] Ogden Suffolk Downs, Inc.

The case was heard by *Abrams*, J.

*Alan R. Hoffman* for Ogden Suffolk Downs, Inc.

*Jamie W. Katz*, Assistant Attorney General, for State Racing Commission.

*Herbert D. Lewis* (*Howard J. Alperin* with him) for the plaintiff.

CUTTER, J. These are appeals by the State Racing Commission (the commission) and Ogden Suffolk Downs, Inc. (the racetrack), from a judgment of the Superior Court in a judicial review under G. L. c. 30A, § 14, reversing a decision of the commission which had denied relief to Catrone, a horse trainer licensed by the commission. The decision dealt with the racetrack's action in refusing Catrone's application (a) for stall space at the racetrack and (b) to enter his horses in races.

The controversy arose on December 18, 1981, when Robert O'Malley, vice-president and general manager of the racetrack, caused a letter to be delivered to Catrone informing him that the racetrack would not allow horses trained by him to be entered in races at Suffolk Downs or permit him to use stall space there. O'Malley, among other matters, asserted in the letter that Catrone's "presence as a trainer at the track would reduce the confidence of . . . [the racetrack's] betting public in the honesty and integrity of racing." The board of stewards later refused to order the racing secretary of the track to accept the entry in a race of a horse owned by Catrone, and Catrone appealed to the commission.

After extended hearings, the commission submitted to counsel in its proceedings proposed findings of fact. Later, the commission made formal findings and rulings (mailed May 27, 1982). Among these were (no. 18) that the racetrack's "decision to exclude . . . Catrone was a reasonable, discretionary, business judgment . . . and was not motivated by items other than those relating to racing generally," and (no. 19) "was not arbitrary or without reason or justification," with the consequence that the racetrack had "not violated the rights of . . . Catrone nor the rules of

[t]horoughbred [r]acing." The findings of the commission and the evidence before the commission are discussed in later parts of this opinion.

1. The judgment must be reversed. The trial judge, in reviewing the commission's decision, purported to make findings as if the proceeding before him constituted a trial de novo.[2] Under § 14, "[it] is . . . the function of the [agency] and not a judge to make findings of fact." See *Reed Natl. Corp.* v. *Director of the Div. of Employment Sec.*, 388 Mass. 336, 340 (1983). See also, as to the duty of the agency and not the court to weigh the credibility of witnesses and decide the facts, *School Committee of Wellesley* v. *Labor Rel. Commn.*, 376 Mass. 112, 120, 127 (1978). The trial judge's decision did not confine his review properly to what, on this record, appear to be the principal (if not the only) issues before him, viz., whether the commission's decision (a) contained errors of law, (b) was supported by substantial evidence, or (c) was arbitrary or capricious.

2. The commission (see G. L. c. 6, § 48) operates under G. L. c. 128A (as materially amended by St. 1978, c. 494, hereinafter "the 1978 revision"). By c. 128A, § 9, the commission is authorized to promulgate regulations, and by § 9A (as amended by the 1978 revision, § 7) it may provide under § 9 for licensing various racing personnel including trainers and jockeys. See *Fioravanti* v. *State Racing Commn.*, 6 Mass. App. Ct. 299, 304-305 (1978), and cases cited. Regulations of the commission affecting horse racing

---

[2] A court may disturb an administrative decision such as this here considered under G. L. c. 30A, § 14(7), as appearing in St. 1973, c. 1114, § 3, only where the court determines that "substantial rights" of a party "may have been prejudiced because the agency decision is (a) [i]n violation of constitutional provisions; or (b) [i]n excess of the statutory authority or jurisdiction of the agency; or (c) [b]ased upon an *error of law*; or . . . (e) [*u*]*nsupported by substantial evidence*; or (f) [u]nwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or (g) [*a*]*rbitrary or capricious*, an abuse of discretion, or otherwise not in accordance with law" (emphasis supplied).

appear in the Code of Massachusetts Regulations (CMR) at 205 CMR § 4.00 et seq. Pertinent provisions of these regulations are mentioned in the appendix to this opinion.

The 1978 revision of G. L. c. 128A effected various changes in the regulation of racing, and stated in § 1 a declaration of statutory policy.[3] These changes, see e.g., new §§ 9A and 10A,[4] and the regulations (now subject, under new § 9B, to special legislative scrutiny), confirm a legislative intention that racetracks be conducted so as to encourage public confidence.

Chapter 128A as amended does not indicate any legislative intention so to regulate Massachusetts racetracks as to make them essentially public utilities in whose races the horses of every licensed owner and trainer may participate. On the contrary, the statutes and the regulations, viewed in

---

[3] The declaration reads in part: "[T]he continued operation of the racing industry in the commonwealth is a matter of public interest; . . . [and] several factors have contributed to . . . [the] industry's *decline and possible demise,* namely: high pari-mutuel commissions for the commonwealth, small purses for horse and dog owners, rapidly increased interstate competition, uncoordinated expansion, and rapidly escalating costs for the industry; . . . several existing laws of the commonwealth prevent the industry from *restoring itself;* . . . the commonwealth, being the recipient of over thirty million dollars annually in revenue, must assume a large share of responsibility in *restoring . . . [the] industry to a healthy position;* and . . . therefore, it is the intent of this act . . . to improve the quality of racing in the commonwealth, . . . [and] *to instill public confidence in the integrity of the sport"* . . . (emphasis supplied).

[4] General Laws c. 128A, § 10A, permits, subject to an appeal to the commission, a Commissioner "or any person licensed to conduct a racing meeting . . . to refuse admission to or eject from its premises any person whose presence on said premises is detrimental, in the sole judgment of the commissioner . . . or of said licensee, to the proper and orderly conduct of a racing meeting." Criminal penalties are provided for violations. Counsel for the racetrack and the Attorney General (for the commission) in their briefs disclaim any contention that the letter of December 18, 1981, was an exercise of the racetrack's power to "eject" Catrone under § 10A. See also 205 CMR § 4.17(4) (1978). Their contention seems to be that, as a private corporation, the racetrack has excluded Catrone from the use of its facilities (as distinguished from attendance at the races) as a matter of business judgment. Contrast *Catrone* v. *Massachusetts State Racing Commn.,* 404 F. Supp. 765, 770 (D. Mass. 1975), vacated and remanded, 535 F.2d 669, 671-672 (1st Cir. 1976).

the aggregate, convince us that a licensed racetrack, except as otherwise clearly provided by statute or valid regulation, remains a private proprietary corporation, at liberty to deal (or reasonably to refrain from dealing) with licensed owners, trainers, and jockeys at least in accordance with a sound business judgment. We perceive no legislative purpose to modify the powers which a racetrack would have possessed apart from present statutory regulation so as to deprive it of discretionary business judgment in determining which licensed horse owners and horse trainers will be allowed to use its facilities. Indeed, the commission by § 4.14(10) (1978), allowing the refusal of race entries without explanation (see the appendix to this opinion) as one of its regulations, in substance has stated formally what is essentially the rule in force in several jurisdictions.[5] In such jurisdictions a proprietary racetrack, even though intensively regulated, need not permit participation in racing by any person, simply because that person has a license from the regulatory commission, and those jurisdictions certainly permit exclusion from such participation on reasonable business grounds. See *Martin* v. *Monmouth Park Jockey Club*, 145 F. Supp. 439, 440-441 (D. N.J. 1956), aff'd per curiam, 242 F.2d 344 (3d Cir. 1957); *Evans* v. *Arkansas Racing Commn.*, 270 Ark. 788, 797-803 (1980), cert. denied, 451 U.S. 910 (1981). See cases involving patrons at race tracks, such as *Greenfeld* v. *Maryland Jockey Club*, 190 Md. 96, 100-106 (1948), *Tamelleo* v. *New Hampshire Jockey Club, Inc.*, 102 N.H. 547, 548-550 (1960), and *Garifine* v. *Monmouth Park Jockey Club*, 29 N.J. 47, 50-57 (1959). See also *Rodic* v. *Thistledown Racing Club, Inc.*, 615 F.2d 736, 739-740 (6th Cir.), cert. denied, 449 U.S. 996 (1980). Compare *Marzocca* v. *Ferrone*, 186 N.J. Super. 483, 487,

---

[5] See as to possibly relevant principles of statutory interpretation, *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-407 (1931); *Corcoran* v. *S.S. Kresge Co.*, 313 Mass. 299, 302-303 (1943); *Hayon* v. *Coca Cola Bottling Co.*, 375 Mass. 644, 648-649 (1978); 3 Sands, Sutherland Statutory Construction § 61.01 (4th ed. 1974 & Supp. 1983) discussing the strict construction of statutes in derogation of the common law.

489-496 (1982), which may attempt to limit the *Garifine* case.

*Cox* v. *National Jockey Club*, 25 Ill. App. 3d 160, 164-167 (1974, holding that a licensee racetrack cannot "arbitrarily and without reason or justification" bar a licensed jockey from a race meeting), and *Jacobson* v. *New York Racing Assn., Inc.*, 33 N.Y. 2d 144, 148-150 (1973), may take a somewhat narrower view (than the cases just cited) of a racetrack's freedom to control participation in racing. The *Jacobson* case, nevertheless, points out (at 150), that the licensee complaining of a racetrack's action excluding the licensee has a "heavy burden to prove that denial," there of stall space, "was not a reasonable discretionary business judgment but was actuated by motives other than those relating to the best interests of racing generally." Compare the diverse views expressed in *Saumell* v. *New York Racing Assn., Inc.*, 58 N.Y. 2d 231, 238-252 (1983). The discussion in *Greenberg* v. *Hollywood Turf Club*, 7 Cal. App. 3d 968, 976-978 (1970), may rest primarily on earlier California decisions.

The Massachusetts decisions as yet have not determined the extent to which a racetrack has power to exclude licensed owners and trainers. Obviously, c. 128A and the racing regulations prevent licensed racetracks from allowing unlicensed persons to participate in racing. On the present facts, we need not draw with precision the boundaries of permissible exclusion of licensed persons. Under the cases already cited, a licensee racetrack at least may exclude licensed persons from participation in racing activity in the exercise of a reasonable business judgment.

3. The comprehensive provisions of G. L. c. 128A and the regulations under it, see *Colella* v. *State Racing Commn.*, 360 Mass. 152, 153, 155-156 (1971); Nolan, Criminal Law § 495 (1976), show that the commission had jurisdiction to consider Catrone's appeal to it from the stewards' refusal to order the racetrack to allow his participation in racing. The commission has been given sufficiently broad powers (including those of granting and suspending licenses,

see e.g., G. L. c. 128A, §§ 2, 3, 9A, 11) to permit it to review the conduct of its licensees in accordance with reasonable procedures set out in its regulations. Although the statutory grant of jurisdiction could have been made more explicit, we reject the racetrack's contention that the commission had no jurisdiction of this situation. Compare *Casa Loma, Inc.* v. *Alcoholic Beverages Control Commn.*, 377 Mass. 231, 233-235 (1979), where every indication from the statutes was that the particular controversy had been left to local control rather than to the commission. In the present case, Catrone properly was afforded by the commission a full hearing with his counsel participating.

4. The commission's decision (already quoted) that the racetrack's exclusion of Catrone "was a reasonable discretionary business judgment" and "not arbitrary" had support in the evidence before it. The commission in effect ruled that the criteria used by it to license Catrone need not have been and were "not necessarily the same as" those used by the racetrack "in not accepting entries of horses trained by him." The commission found that "between 1972 and 1978 the reputation of [the racetrack] . . . [had] reached a low ebb" which was "reflected . . . in a reduction in the quality of [its] racing," but that from 1979 on, that reputation had "been improving." Thus the commission, in effect, took a view closely similar to the legislative declaration in § 1 of the 1978 revision of c. 128A (see note 3, *supra*) that the racing industry in Massachusetts had been in a state of "decline" and needed "to instill public confidence in . . . [its] integrity." Essentially, the commission recognized that the racetrack could exclude a licensed trainer because of undesirable conduct and associations or for reasons in the interest of racing, all of which might not have been sufficient to require the commission to refuse the trainer a license.

5. Evidence was submitted which, among other things, tended to show that Catrone had been the trainer of horses which might reasonably have been suspected of being "ringers" (that is, different horses from the horses in whose names

they were raced); that he had been charged with racing of-
fenses in a United States District Court but had been acquit-
ted; that he from time to time had been suspended, at least
temporarily, from racing privileges by racing commissions
in other States; and that he had operated without a license
on at least one occasion. There was some evidence that
Catrone had an unfavorable reputation in some racing cir-
cles. As already stated, it well may be that the evidence
was not sufficiently definite to justify a commission in refus-
ing to give Catrone a license or to require a commission to
revoke his license, or to sustain disciplinary proceedings for
particular misconduct. The evidence, however, could be
viewed as showing that Catrone had been at or dangerously
near situations which reasonably could be thought to have
been detrimental to good racing standards. The racetrack
could reasonably feel that Catrone was an avoidable poten-
tial source of future difficulty.[6]

The aggregate of the evidence gave sufficient support to
the commission's decision. The commission on the evidence
could properly conclude that the racetrack, in excluding
Catrone from racing, proceeded within the range of a rea-
sonable business judgment as to the detrimental effect on its
business and reputation which Catrone's participation
might cause to a racetrack trying to improve its standing
with the racing public. "[N]othing in the record . . . [indi-
cates] that the decision was whimsical or not based on
logical analysis." See *Great Atl. & Pac. Tea Co.* v. *License
Commrs. of Springfield,* 387 Mass. 833, 839 (1983).

6. The commission appropriately could have made more
detailed findings about Catrone's past conduct upon which
they relied and on which they concluded that the racetrack
itself had properly relied. The commission, however, made
clear what it was deciding. See *Jordan Marsh Co.* v. *As-*

---

[6] In the light of the testimony of a representative of the Thoroughbred
Racing Protection Bureau, Inc., for example, about investigations for that
body of some of the matters mentioned above in this par. 5, the racetrack
could reasonably have expected continuing scrutiny of Catrone's conduct.

*sessors of Malden,* 359 Mass. 106, 110 (1971). As the commission obviously construed its own rules, see the *Fioravanti* case, 6 Mass. App. Ct. at 302-303, the issues before them were either (1) whether the racetrack was within the terms of the commission's own rule, 205 CMR § 4.14(10) (1978), giving the racetrack authority to refuse entries without furnishing any reason, or (2) if the commission applied the more restrictive rule of some cases (e.g., the New York decisions, such as the *Jacobson* case, 33 N.Y. 2d at 150) already cited, whether the racetrack was acting within the limits of a "reasonable discretionary business judgment." On either basis, the findings show that the commission had decided that the racetrack was acting reasonably to avoid any possible involvement in evils of the type discussed in the *Fioravanti* case, 6 Mass. App. Ct. at 304, and in the *Martin* case, 145 F. Supp. at 441. There it was indicated that racing is a sport "where the greatest importance should attach to dissipating any cloud of association with the undesirable, and in which the appearance as well as the fact of complete integrity is of paramount consideration."

7. We perceive no basis for holding that the racetrack's exclusion of Catrone from racing activity amounts to "State action." It is clear from the record that the racetrack excluded Catrone by itself on its own responsibility. The stewards, only one of whom was appointed by the commission, see 205 CMR § 4.39(1) and (2) (1978), in Appendix 1, merely refused to interfere with the racetrack's action. The racetrack was not "performing any traditional and exclusive State function." No State or commission "action was involved in the particular conduct that is challenged as wrongful," at least until Catrone's appeal to the commission from the inaction of the stewards. The commission's decision dealt with the racetrack's exclusion of Catrone as action *by the racetrack* which was permissible action for a "private corporation," which as licensee "must use reasonable business judgment in its . . . operation." See *Phillips* v. *Youth Dev. Program, Inc.,* 390 Mass. 652, 656-657 (1983), and authorities cited. See also *Fulton* v. *Hecht,* 545 F.2d 540,

542-543 (5th Cir.), cert. denied, 430 U.S. 984 (1977); *Rodic* v. *Thistledown Racing Club, Inc.,* 615 F.2d 736, 739-740 (6th Cir.), cert. denied, 449 U.S. 996 (1980). Compare the discussions in *Fitzgerald* v. *Mountain Laurel Racing, Inc.,* 607 F.2d 589 (3d Cir.), cert. denied, 446 U.S. 956 (1980), and in *Sims* v. *Jefferson Downs, Inc.,* 611 F.2d 609, 611-612 (5th Cir. 1980).

In reaching this conclusion, we have considered, of course, the 1976 decision of the United States Court of Appeals for the First Circuit in *Catrone* v. *Massachusetts State Racing Commn.,* 535 F.2d 669 (1st Cir. 1976), which dealt with an earlier exclusion of Catrone apparently treated as State action under G. L. c. 128A, § 10A. See note 4, *supra.* That court, upon principles of abstention (at 671), vacated a decision by a United States District Court judge granting relief to Catrone in an action under 42 U.S.C. § 1983 (1970) arising from the 1976 exclusion. As already pointed out (see note 4, *supra*) we (and the racetrack and the commission) do not regard this case as based upon § 10A, but upon rights of the racetrack, remaining to it as a private corporation despite statutory regulation, to engage at least in action based upon a reasonable business judgment, but subject to review by the commission. This case, of course, does not directly involve § 1983. It comes before us on a wholly different record from that involved in the 1976 Federal case.

8. The judgment is reversed. A new judgment is to issue in the Superior Court (a) dissolving any State injunction purporting to bar action by the racetrack excluding Catrone from participating in racing, and (b) affirming the decision of the commission.

*So ordered.*

APPENDIX.
PERTINENT COMMISSION REGULATIONS

Commission regulations to be considered include the following provisions of 205 CMR (1978):

§ 4.01, *twelfth par.*, granting an appeal to the commission with respect to "a dispute . . . concerning a ruling by a steward or other racing official."

§ 4.03(1), dealing with appeals to the commission "in the case of any person penalized or disciplined by the racing officials of a meeting licensed by the [c]ommission."

§ 4.14(10). "The entries of any person . . . may be refused with or without either notice or reason being given therefor."

§ 4.17(4), requiring "[e]very person participating in and every patron of a licensed [r]ace [m]eeting" to abide by the statutes and the commission's rules and to "accept the [s]tewards' decisions on any and all questions to which their authority extends, subject to the right of appeal to the [c]ommission."

§ 4.24(1), requiring certain officials employed by the "Association" conducting a race meeting to "be approved in writing by the [c]ommission," including "all stewards [and] racing secretaries."

§ 4.39(1), listing as officials of a race meeting, "Three (3) [s]tewards . . . the [r]acing [s]ecretary; and the [c]lerk of the [c]ourse, who shall be the [r]acing [s]ecretary of the [a]ssociation holding the racing meeting." Subsection (2) provides that one steward shall be appointed by the commission, but that the licensee is to appoint (subject to the commission's approval) all other officials.

§ 4.40(6), reading in part, "The [r]acing [s]ecretary shall receive all entries and declarations."

§ 4.44(7), providing that the stewards "shall have the power to determine all questions arising with reference to entries and racing."