CARLOS A. PEREZ vs. STATE RACING COMMISSION.

Suffolk.   September 12, 1986. — December 18, 1986.

Present: ARMSTRONG, CUTTER, & BROWN, JJ.

*Racing. State Racing Commission. Administrative Law,* Regulations. *Injunction. Search and Seizure,* Administrative inspection.

Discussion of the statutory policy and broad aspects of the public interest which support close governmental regulation of horse racing with parimutuel betting. [270-273]

In an action against the State Racing Commission by the holder of an assistant trainer's license, alleging that he had been illegally subjected to a warrantless administrative search by State police on the premises of the horse race track where he was employed and that, as a result, he had been accused of selling drugs and permanently barred from the track, there was no abuse of discretion in a judge's denial of the plaintiff's request for a preliminary injunction restraining the commission from interfering with his "right to earn a living as an assistant trainer" pending the resolution of the proceeding, where the evidence did not demonstrate that denial of the injunction would create a substantial risk of irreparable harm to the plaintiff; where the record on appeal did not furnish sufficient facts to permit a determination of issues, possibly of constitutional dimension, arising from the allegedly illegal search; and where the importance of countervailing considerations of public confidence in the integrity of the racing industry outweighed any risk of harm to the plaintiff. [273-277]

CIVIL ACTION commenced in the Superior Court Department on February 28, 1986.

Proceedings for preliminary injunctive relief were heard in the Superior Court Department by *John J. Irwin, Jr.,* J., and were considered in the Appeals Court by *Smith,* J.

*Harris Krinsky* for the plaintiff.

*Steven H. Goldberg,* Assistant Attorney General, for the defendant.

CUTTER, J. Perez on January 11, 1986, held an assistant trainer's license issued to him by the State Racing Commission

(the Commission). He was employed then by Anthony Manzo, at Ogden Suffolk Downs Race Track (the track) and was engaged in his duties in Manzo's barn on premises at and owned by the track. He was taken into custody there by a State trooper and others. They led him to a "tack room". There he was searched and was accused by employees of the track and the State police of selling drugs.

The foregoing circumstances are set forth (a) on the basis of allegations in Perez's substitute complaint in the Superior Court filed March 5, 1986, to which no answer until April 7, 1986, appears on the Superior Court docket,[1] and (b) on various affidavits filed by Perez. The present proceeding before this court is on a petition for interlocutory relief under G. L. c. 231, § 118, first par. and for an injunction under Mass.R.A.P. 6(a), as appearing in 378 Mass. 930 (1979). See *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. 609, 612-618 (1980). That petition recites that on February 27, 1986, a Superior Court judge denied Perez's prayer for a preliminary injunction restraining the Commission from interfering with his "right to earn a living as an assistant trainer pending the resolution of the . . . action on the merits" and, alternatively, pending appeal.[2]

---

[1] The present record does not contain (a) the original complaint filed in the Superior Court on February 28, 1986, or the answer thereto, (b) the transcript of a hearing on February 12, 1986, before the Commission, at which it appears from the denial (on February 21) of Perez's appeal to it, evidence was received, or (c) the transcript of any other hearing before the Commission, the Superior Court, or the single justice of this court. In the course of proceedings before the Commission (to obtain a reversal of an order of the track and the State police, acting for the Commission, permanently ejecting Perez from the track), Perez filed a motion to suppress articles taken from his person when he was searched. That motion, which does appear in the record, was denied.

[2] A single justice of this court denied a preliminary injunction, so far as such relief was sought pursuant to the first paragraph of c. 231, § 118. He denied also the relief requested under Mass.R.A.P. § 6(a). In addition, however, he ordered that the clerk of the Superior Court "forthwith assemble the record of . . . [Perez's] appeal pursuant to . . . [par. 2 of] § 118" and that the appeal be "tentatively scheduled for the June/September list for oral argument." We interpret this order as a direction that denial of relief by the Superior Court judge be considered by a panel of this court. We are

The petition to this court essentially incorporates by reference Perez's substitute complaint in the Superior Court and an affidavit of Perez, dated merely "this      day of February, 1986." Little information is afforded (in addition to that stated in the first paragraph of this opinion), except that the substitute complaint alleges (par. 12) that among Perez's "effects seized . . . was a list of names with dollar amounts next to . . . [the] names" and (par. 13) that "[o]n the basis of . . . [that] list of names" he "was permanently ejected from the grounds of the . . . [t]rack, without a hearing, by an order of the . . . State Police acting under the authority of [t]he Commission." The petition to this court further recites that Perez claimed an appeal to the Commission for the track's order of ejectment, that the Commission denied his appeal, that, by way of the substitute complaint, Perez sought judicial review in the Superior Court of the Commission's order and a preliminary injunction, and that the Superior Court motion judge denied a preliminary injunction. See also note 2, *supra*.

The petition now before us then proceeds somewhat vaguely to allege that it was error not to grant the preliminary injunction because the Commission's decision (a) was based on illegally seized evidence which should have been suppressed, (b) was unsupported by substantial evidence, and (c) "was based upon unlawful procedure as [t]he Commission was the only available body" to hear both the motion to suppress and the case on the merits. The substitute complaint also asserts that a regulation promulgated by the Commission (see note 5, *infra*) is unconstitutional.

1. *Pertinent Statutes and Regulations*.

General Laws c. 128A provides for strict regulation of horse and dog racing in Massachusetts. The original 1934 statute (St.

---

by no means sure that this order amounts to a "report" to a panel by the single justice of his own denial of a preliminary injunction and of the similar action by the trial judge. See the *Packaging Indus. Group, Inc.* case, 380 Mass. at 614. Nevertheless, as the matter has been fully briefed and argued, we consider the matter as a reported denial of a preliminary injunction by the trial judge and, in connection therewith, the similar denial by the single justice.

1934, c. 374, § 3) was revised considerably by St. 1978, c. 494. See *Catrone* v. *State Racing Commn.*, 17 Mass. App. Ct. 484, 486-487 & n.3 (1984), in which is quoted the strong declaration of policy[3] set out in § 1 of the 1978 revision. The revision substantially strengthened the Commission's power and ability to control horse racing in the public interest.[4]

Chapter 128A, § 9, has, since 1934, given to the Commission "full power to prescribe rules, regulations and conditions under which all horse . . . races at horse . . . racing meetings shall be conducted." Section 9 also provides that "any person violating any . . . regulation shall, upon a complaint brought by the commission, be punished by a fine not exceeding five thousand dollars or by imprisonment not exceeding one year, or both." Other provisions affecting regulations are set out in §§ 9A and 9B.

The Commission has promulgated a regulation, 205 Code Mass. Regs. § 4.17(27) (1985), which is set out in the margin.[5]

---

[3] That declaration stated that one purpose of the revision was "to instill public confidence in the integrity of the sport."

[4] Among further powers given to the Commission by the present form of c. 128A are: *§ 7*, the power to appoint one steward to each licensed track and one or more representatives to attend each licensed racing meeting with access to specified books and papers and "full and free access" to premises used in connection with racing; *§ 8*, the power to obtain the assignment of police officers (to be under "the operational authority of the [C]ommission") and to employ various technicians, veterinarians etc.; *§ 9*, to enable the Commission "to exercise . . . a proper control over . . . racing," the power to prescribe under § 9 "rules, regulations and conditions" for licensing various persons, including "owners, trainers, jockeys and stable employees at horse tracks," who shall be fingerprinted and required to "wear a badge containing a photograph," and also to provide for the suspension and revocation of such licenses; and *§ 10A*, the power to exclude (subject to appeal to the Commission) from the track premises or eject "any person whose presence . . . is detrimental, in the sole judgment of . . . [a] commissioner . . . or . . . [a] licensee, to the proper . . . conduct of a racing meeting."

[5] The regulation reads in part, "Every racing Association, the Commission or the Stewards investigating for violations of the law or the Rules of Racing adopted by the Commission shall have the right to permit persons authorized by any of them to search the person, or enter and search the buildings, stables, . . . or other places within the grounds of the association, or at other places where horses which are eligible to race are kept together with the personal property and effects contained therein. Every licensed person

2. *The Statutory Policy.*

The broad aspects of the public interest which support close regulation of horse racing with pari-mutuel betting were stated in *Colella* v. *State Racing Commn.*, 360 Mass. 152, 159 (1971): "The Legislature recognized the existence of . . . dangers ['inherent in any gambling operation of such proportions'] unless the racing meetings were strictly governed and controlled by rules covering the many details which the statute did not cover. It contemplated that the Commission would be best equipped to supervise the racing operations, and it gave the Commission the very broad powers necessary to accomplish the purpose." In *Fioravanti* v. *State Racing Commn.* 6 Mass. App. Ct. 299, 305 (1978), it was said, "In testing the constitutionality of a [Commission] regulation . . ., all rational presumptions are made in favor of the validity of the regulation. It will be struck down only if it 'cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it.' . . . Horse racing accompanied by gambling is particularly susceptible to fraud and corruption. The Legislature has recognized these dangers and has given broad powers to the commission to control racing operations strictly."

Regulations of the Commission[6] have been sustained in a variety of circumstances. In the *Colella* case, 360 Mass. at 155-159, a rule regulating the fees paid to jockeys in the absence of special agreement was sustained. In the *Fioravanti* case, 6 Mass. App. Ct. at 302-305, this court sustained a rule making

---

or person permitted to pursue his/her occupation or employment within the grounds of any association by accepting his/her license or such permission does thereby irrevocably consent to such search as aforesaid and waive and release all claims or possible actions for damages that he/she may have by virtue of any action taken under this rule."

[6] In *Bay State Harness Horse Racing & Breeding Assn.* v. *State Racing Commn.*, 342 Mass. 694, 698-700 (1961), it was assumed that, in framing regulations under c. 128A, § 9, the Commission would be required "to apply general standards of public interest, convenience, and necessity, similar to those which have been sometimes implied in the regulation of public utilities." It was also assumed that the statute (and the regulations pursuant to it) should be so interpreted "as to avoid serious doubts about . . . [their] constitutional validity." *Id.* at 699.

a horse trainer "responsible for the presence of prohibited articles [there drugs for horses] . . . without regard to his knowledge of their presence." *Id.* at 302. In the *Catrone* case, 17 Mass. App. Ct. at 491, the same race track involved in this case was sustained in excluding (as a matter of business judgment) under the Commission's statutes and regulations, a licensed trainer from racing because he "had been at or dangerously near situations which reasonably could be thought to have been detrimental to good racing standards."

3. *Effect of Licensee's Conduct on Public Interest.*

We approach this case with recognition that the Legislature for a long time has tried to ensure that horse racing will be conducted lawfully and in a manner which will encourage public confidence. The Commission and any licensed private entity engaged in running a race track (see the *Catrone* case, 17 Mass. App. Ct. at 490-493) reasonably could conclude, as a matter of business judgment, that the unlawful distribution of drugs (either for human use, or for use on horses, see, 128A, § 13B) by licensees working at a race track inevitably would be highly detrimental to racing. In other jurisdictions, race track stewards or other officials have been upheld in enforcing comparable rules or regulations designed to prevent harmful conduct by licensees. See *Shoemaker* v. *Handel,* 795 F.2d 1136, 1142-1144 (3d Cir. 1986, breathalyzer and other testing of jockeys, and random selection of trainers for other tests); *Pullin* v. *Louisiana State Racing Commn.,* 477 So.2d 683 (La. 1985), *S.C,* somewhat revised, 484 So.2d 105 (La. 1986); *Delguidice* v. *New Jersey Racing Commn.,* 100 N.J. 79 (1985); *Peterson* v. *Pennsylvania State Horse Racing Commn.,* 68 Pa. Commw. 353 (1982). See also *Lanchester* v. *Pennsylvania State Horse Racing Commn.,* 16 Pa. Commw. Ct. 85, 93 (1974).

4. *Aspects of the Request for Preliminary Injunction.*

Perez, on the basis of allegations in his substitute complaint and affidavits, seeks an injunction under the first paragraph of G. L. c. 231, § 118, a matter essentially discretionary. See *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. at 612-618. That case states standards for action by a trial judge (or

a single justice of this court) in deciding whether preliminary injunctive relief should be afforded. Such a judge should consider, among other matters, whether the grant or denial of preliminary relief, if warranted at all, is more likely to cause irreparable harm to one or the other of the contending parties. Perez here has not established a record making it appropriate for us to hold that it was an abuse of discretion for the trial judge (and the single justice) to deny a preliminary injunction.

Perez, in effect, makes a general attack on 205 Code Mass. Regs. § 4.17(27) (1985) as inherently violating constitutional restraints on searches of individual persons. Enough has been said above to make it plain that horse racing (when conducted with pari-mutuel betting) is a strictly and pervasively regulated occupation. An administrative search in a closely regulated occupation (there the drug industry and the sale of drugs) was dealt with in *Commonwealth* v. *Lipomi*, 385 Mass. 370, 375-385 (1982). For that case, apparently on a full record of proceedings in the Superior Court and during the administrative search (at 371-372, 376-377, especially nn.3-5), the court (with two Justices dissenting) affirmed the suppression of items seized in the search. What is said in the majority opinion shows that every purported broad authority to conduct warrantless searches (there G. L. c. 13, § 25) is likely to be scrutinized with great care in its application to any particular case.

The *Lipomi* decision (at 378-380) reviewed pertinent decisions of the Supreme Court of the United States, especially *Colonnade Catering Corp.* v. *United States*, 397 U.S. 72 (1970), *United States* v. *Biswell*, 406 U.S. 311 (1972), and *Donovan* v. *Dewey*, 452 U.S. 594 (1981). It was concluded[7]

---

[7] The opinion also said: "Three factors must be present. 'First, the enterprise sought to be inspected must be engaged in a pervasively regulated business. The presence of this factor insures that warrantless inspection will pose only a minimal threat to justifiable expectations of privacy. Second, warrantless inspection must be a crucial part of a regulatory scheme designed to further an urgent [governmental] interest. And third, the inspection must be conducted in accord with a *statutorily authorized* procedure, itself carefully limited as to time, place, and scope. The presence of this factor guards against the possibility that any inspection right will be abused.' " *Commonwealth* v. *Lipomi*, 385 Mass. at 380, quoting from *Dunlop* v. *Hertzler*

that the combined effect of these and other Federal decisions was that "a warrant may not be constitutionally required when [the Legislature] has reasonably determined that warrantless searches are necessary to further a regulatory scheme." *Commonwealth* v. *Lipomi*, 385 Mass. at 380, quoting from *Donovan* v. *Dewey*, 452 U.S. at 600.

Perez contends that § 4.17(27) does not meet the requirements of the *Lipomi* case (see the quotation in note 7, *supra*) and the Supreme Court cases just mentioned (a) because it is a regulation and not a statute,[8] and (b) because it imposes, as a condition of being a licensee of the Commission, an unconstitutional requirement of consent to any search permissible under § 4.17(27).[9] A further and related contention by Perez's counsel is that § 4.17(27) and c. 128A as a whole do not sufficiently limit the time, place, and scope of warrantless searches. See the discussion in the *Lipomi* case, 385 Mass. at 382-383.[10]

---

*Enterprises, Inc.*, 418 F. Supp. 627, 631-632 (D. N.M. 1976; emphasis supplied). See generally 3 LaFave, Search and Seizure § 10.2 (1978 & Supp. 1986). As to the admissibility before State administrative tribunals of evidence found in administrative searches, see 1 LaFave, *supra*, § 1.5. See also the discussion in *Commonwealth* v. *Cadoret*, 15 Mass. App. Ct. 654, 657-659 (1983).

[8] The present record does not establish when § 4.17(27) was adopted by the Commission or whether it has been subjected to the scrutiny of the Legislature's Joint Committee on Government Regulations by virtue of c. 128A, § 9B. We need not decide now whether § 9B is a valid provision. See *Opinion of the Justices*, 397 Mass. 1201, 1208 (1986); Cella, Administrative Law and Practice § 46 especially n.13 (1986). See and compare *Bowsher* v. *Synar*, 478 U.S. 714, 721-734 (1986). See also *Immigration & Naturalization Serv.* v. *Chadha*, 462 U.S. 919, 951-959 (1983).

[9] See *Shoemaker* v. *Handel*, 795 F.2d at 1142-1144. Compare *Security Employees, Dist. Council 82* v. *Carey*, 737 F.2d 187, 203-211 (2d Cir. 1984). Compare also *Blackburn* v. *Snow*, 771 F.2d 556, 568-569, 573-577 (1st Cir. 1985).

[10] Doubtless § 4.17(27) reflects in some degree, the expectations of framers of legislation and administrative regulations at a time, see the *Lipomi* case at 382, "when the police powers regarding regulatory inspections of the State were perceived to be far broader than they are today." See *Frank* v. *Maryland*, 359 U.S. 360, 367-372 (1959), and the changes growing out of *Camara* v. *Municipal Court of the City of San Francisco*, 387 U.S. 523 (1967), and *See* v. *Seattle*, 387 U.S. 541 (1967). The regulation and related statutes may not sufficiently take into account considerations deemed impor-

All the contentions advanced in behalf of Perez, however, fall far short of showing abuse of discretion on the part of the trial judge and the single justice in denying preliminary injunctive relief. The problems are discussed by Perez's counsel in a vacuum (without any detailed record of underlying facts and without the complete administrative record before the Commission, see, e.g,. note 1, *supra*) on the basis of pleadings and affidavits in large measure stated as conclusions.[11] The record does not furnish the facts to make possible (a) a determination of the extent (if at all) § 14.17(27) was employed, or (b) any interpretation of the regulation to bring it within limits suggested by the decided cases.

The record does show that Perez was a high school graduate (and thus potentially employable in a number of occupations), but the judges who denied preliminary injunctive relief were given little other information concerning the hardship to Perez likely to result from denial of that relief. They were warranted fully in recognizing the substantial countervailing public interest considerations, e.g., the importance to the racing industry and to public confidence in its avoiding any suspicion or any appearance of participation by Perez, a licensee, in unlawful drug distribution.

---

tant in the *Biswell* case, 406 U.S. at 316-317, *Donovan* v. *Dewey*, 452 U.S at 603-606, and the *Lipomi* case, 385 Mass. at 382-387. Indeed, what is said in those decisions (and in the cases cited in them) might well lead the Commission promptly to give consideration to framing new and clarifying regulations, and perhaps even to seek perfecting legislation.

[11] We, for example, have nothing in this record which tells us (a) who initiated the search of Perez, e.g., whether it was the Commission, the licensee track, or the police; (b) what basis existed to cause suspicion or probable cause leading to a search; (c) what the significance was of the item or items seized from Perez; (d) to what extent a regulatory scheme of periodic inspections of the track premises and licensees had been instituted and was involved in this search; (e) whether and to what extent particular indications of drug distribution at the track made the search a matter of exigency; and (f) to what extent representatives of the Commission, the race track licensee, and the police assigned to the track respectively participated. We are not informed also what the prior record of Perez at the track had been and whether and to what extent that record was a basis for his removal from the track.

We hold that, in the absence of a substantially more complete record, Perez has not shown an abuse of discretion by the trial judge or by the single justice in denying a preliminary injunction. They were amply justified in deciding that (even if the record's deficiencies may be cured at a trial on the merits) they should not consider, at a preliminary stage and on an inadequate record, important issues possibly of constitutional dimension.

*Order denying preliminary injunctive relief affirmed.*