Dear Mr. Schertle:
On behalf of the Maryland Racing Commission, you have requested our opinion about the exclusion of licensees by a racing association.[1] Specifically, you ask whether "a racing association, operating under a license granted by the Commission, [may] exclude from its premises an individual licensed by the Commission (e.g. owners, trainers, drivers/jockeys, stable employees) in the absence of a suspension or revocation of the individual's license by the Commission."
Our opinion is as follows: Even if the Commission has taken no disciplinary action against a licensee, a racing association may exercise its common law property right to exclude the licensee from its grounds. The association's exclusion, however, may not be based on an unlawful criterion — the race or gender of the licensee, for example. Furthermore, although a prediction cannot be made with confidence, given the monopolistic control of horse racing in Maryland, Maryland courts might require the association to offer a reasonable justification for an exclusion. In reaching these conclusions, our analysis considers the general common law right of a property owner to exclude an individual from the owner's grounds; for comparison purposes, the common law rule as it relates to a racing association's exclusion of a patron; the common law rule as it relates to a racing association's exclusion of an individual licensed by a state racing commission; the effect of a racing association's monopolistic or "quasi-monopolistic" control of horse racing in regard to its exclusion of a licensee; and the issue of "state action."
 I Background
At a cocktail party, a former part-owner of the mile thoroughbred race tracks in Maryland made discourteous remarks to the sister of the tracks' current majority shareholder. The tracks' majority shareholder subsequently ordered that the tracks' former part-owner, who is currently licensed by the Commission as an owner of thoroughbred race horses, be denied entry to the racetrack grounds unless and until a written apology was submitted. The exclusion was enforced on an important day of racing, "Maryland Million" day.[2] The former part-owner then submitted a letter of apology, and the exclusion was lifted.
Subsequently, the former part-owner, through counsel, filed a petition for a declaratory ruling pursuant to Title 10, Subtitle 3 of the State Government Article, Maryland Code. The petition requested the Commission to declare that a racing association does not have the right to exclude an individual, otherwise duly licensed by the Commission, unless the Commission first exercises its regulatory authority over the individual. Petition for Declaratory Ruling, Case No. 96-MRCT-06, Maryland Racing Commission. The Commission denied the petition, noting that a declaratory ruling of an administrative agency was only for the purpose of an agency's declaring its position in regard to an existing statute, regulation, or order of that agency. Concerning this issue, there was none. Memorandum and Order, Case No. 96-MRCT-06, Maryland Racing Commission.
Thereafter, counsel for the former part-owner appeared before the Commission and, after observing that his client preferred to avoid litigation, suggested that the Commission request the opinion of this office on the matter. Commission Minutes (April 10, 1996). The Commission did so to obtain clarification of a recurring issue[3]
— the propriety of a licensee's exclusion by a racing association without any suspension or revocation of licensure by the Commission.
 II Exclusion of Patrons
The common law right to exclude an individual from one's private property has long been a fundamental tenet of real property law. As stated by Justice Brandeis: "An essential element of individual property is the legal right to exclude others from enjoying it." International News Service v.Associated Press, 248 U.S. 215, 250 (1918) (Brandeis, J., dissenting). Stated otherwise, "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." Loretto v. TeleprompterManhattan CATV Corp., 458 U.S. 419, 435 (1982).
More than 80 years ago, the United States Supreme Court upheld the right of a racing association to exclude a patron from its premises. Marrone v. Washington Jockey Club, 227 U.S. 633
(1913).[4] This right has consistently been upheld by later cases in both the federal and state courts. For example, in the frequently cited case of Madden v. Queens County Jockey Club,72 N.E.2d 699 (N.Y.), cert. denied, 332 U.S. 761 (1947), the plaintiff, "Coley" Madden, a self-professed "professional patron of the races," was excluded from Aqueduct racetrack in New York by the racing association under the mistaken belief that he was "Owney" Madden, reputed to be a bookmaker for organized crime. In upholding the dismissal of a suit brought by "Coley" Madden against Aqueduct, the New York Court of Appeals addressed the issue of whether the operator of a racetrack can, without reason or sufficient excuse, exclude a person from attending the races. The court held that a racing association has the power to admit as spectators those whom it may select and to exclude others solely of its own volition (even if premised upon a mistaken belief), as long as the exclusion is not founded upon race, creed, color, or national origin. The court explained:
 At common law, a person engaged in a public calling, such as an inn keeper or common carrier, . . . was obliged to serve, without discrimination, all who sought service. On the other hand, proprietors of private ] enterprises, such as places of amusement and resort, are under no such obligation, enjoying an absolute power to serve whom they please. A racetrack, of course, falls within that classification.
72 N.E.2d at 698 (emphasis added, citations omitted). See also,e.g., Flores v. Los Angeles Turf Club, Inc., 361 P.2d 921 (Cal. 1961); Tamelleo v. New Hampshire Jockey Club, Inc., 163 A.2d 10
(N.H. 1960); Garifine v. Monmouth Park Jockey Club, 148 A.2d 1
(N.J. 1959). See generally Annotation, Propriety of Exclusion ofPersons from Horseracing Tracks for Reasons Other Than Color orRace, 90 A.L.R.3d 1361 (1979).
The same conclusion regarding a patron at a racetrack has consistently been applied by the Maryland appellate courts. SeeSilbert v. Ramsey, 301 Md. 96, 482 A.2d 147 (1984); Greenfeld v.Maryland Jockey Club, 190 Md. 96, 57 A.2d 335 (1948). In Silbert, the Court of Appeals held that the common law right of a racing association to exclude a patron from its grounds had not been abrogated by either the Maryland Public Accommodations Law, Article 49B, § 5 of the Maryland Code, or the Legislature's creation of the Maryland Racing Commission and the rules and regulations adopted by the Commission. In regard to the latter argument, the Court noted that there was no regulation specifically concerning the exclusion of "undesirables," and, therefore, there was no evidence suggesting a legislative or administrative agency intent to abrogate the common law.301 Md. at 107.
 III Exclusion of Licensees
The courts have uniformly held that a racing association may exclude from its premises licensees (i.e., individuals duly licensed by a state racing commission, such as owners, trainers, jockeys, drivers and stable employees), although no disciplinary action has been taken by a state racing commission.[5] There is a split of authority, however, over the grounds for exclusion. Some courts have concluded that a racing association may exclude a licensee without any cause, just as it may exclude patrons without cause. Other courts have required the racing association to adhere to some standard to justify its exclusion of a licensee, particularly in a situation of monopoly control.
A. Application of Common Law Rule
Some cases simply uphold the common law rule. For example, in Martin v. Monmouth Park Jockey Club, 145 F. Supp. 439 (D.N.J. 1956), aff'd, 242 F.2d 344 (3rd Cir. 1957), a racing association in New Jersey excluded a jockey who had previously been suspended in Maryland for betting on a horse that was racing against the one he was riding. The exclusion was invoked by the racing association notwithstanding the fact that both the Maryland and New Jersey racing commissions had reinstated the jockey's license. In upholding the exclusion of the jockey by the racing association, the court stated:
 Although it is intensely regulated, the defendant Club [the racing association] is a private organization. Nothing is more elementary than its right as a private corporation to admit or exclude any
persons it pleases from its private property, absent some definite legal compulsion to the contrary. For example, the [association] may not exclude patrons because of their race. But nowhere in the statutes or rules governing racetracks is there any indication that simply because he has a license from the New Jersey Racing Commission a jockey thereby possesses a right to ride at any track in the state despite the wishes of its owners.
145 F. Supp. at 440 (emphasis added, citation omitted).
More recently, in Bresnik v. Beulah Park Limited Partnership,Inc., 617 N.E.2d 1096 (Ohio 1993), the Ohio Supreme Court rejected the claim of a jockey agent, licensed by the Ohio State Racing Commission, that his exclusion from the racetrack by the racing association constituted a tortious interference with contract. The court held that Beulah Park, as the proprietor of a private enterprise, had "a common-law right to exclude persons from its business premises absent specific legislative language to the contrary." 617 N.E.2d at 1097. Paralleling the federal court's decision in Martin (and paralleling the reasoning of the Maryland Court of Appeals in Silbert v. Ramsey regarding a patron), the Ohio court rejected the claim that a statutory enactment empowering the state racing commission, and not a racing association, to exclude licensees (here, a jockey agent) from racetracks abrogated the common law.
B. Modification of Common Law Rule
Other courts, while recognizing a racing association's common law right to exclude a licensee even in the absence of any action by a state racing commission, have added a requirement that the basis for the exclusion not be arbitrary or contrary to public policy. For example, in Catrone v. State Racing Commission,459 N.E.2d 474 (Mass.App. 1984), a horse trainer, licensed by the state racing commission, received a letter from the general manager of Suffolk Downs, a thoroughbred racetrack near Boston, advising him that his horses would not be entered in races at the track, and that he would not be permitted to use stall space at the racetrack. The track's manager asserted that Catrone's "presence as a trainer at the track would reduce the confidence of . . . [the racetrack's] betting public in the honesty and integrity of racing." 459 N.E.2d at 475.[6] The state racing commission then conducted a hearing on the propriety of the exclusion.[7] Following the hearing, the Massachusetts commission concluded that the racetrack's "decision to exclude . . . Catrone was a reasonable, discretionary business judgment . . . and was not motivated by items other than those relating to racing generally, and was not arbitrary or without reason or justification." Id. Noting that the horses of every licensed owner and trainer were not entitled to participate in racing at a racetrack, the court went on to state that it was not the intent of the Massachusetts legislature "to regulate Massachusetts racetracks as to make them essentially public utilities in whose races the horses of every licensed owner and trainer may participate":
 On the contrary, the statutes and regulations, viewed in the aggregate, convince us that a licensed racetrack, except otherwise clearly provided by statute or valid regulation, remains a private proprietary corporation, at liberty to deal (or reasonably to refrain from dealing) with licensed owners, trainers and jockeys at least in accordance with a sound business judgment.
459 N.E.2d at 476 (emphasis added).[8] Thus, although applying the common law rule to the exclusion of a licensee by a racing association, the court qualified the common law rule by requiring that the decision to exclude be premised, at a minimum, upon a "sound business judgment" and not be made arbitrarily or without cause.
In Marzocca v. Ferone, 461 A.2d 1133 (N.J. 1983), the owner of a standard bred race horse, stabled and racing at Freehold Raceway in New Jersey, was requested by the Freehold racing association not to ship his horse to Yonkers Raceway, in New York, due to the shortage of horses at Freehold. The owner declined to honor the racing association's request and raced his horse in New York. Thereafter, when the owner attempted to return to Freehold, the racing association refused to accept the eligibility papers of the horse for entry into any of the races conducted at Freehold. Although the court held that the racing association's common law right to exclude was applicable to this situation, the court limited the common law doctrine "by proscribing exclusions that violate public policy." 461 A.2d at 1137.[9] In so doing, the court pointed to its cases involving employment at will. Those cases hold that, although a contract of employment is terminable at the discretion of the employer, the employer's action is subject to challenge when the termination is for reasons that contravene public policy.[10] Nevertheless, in this case, the court found that the actions of the racing association did not contravene public policy.
C. Modification of Common Law Rule — Monopoly Control ofRacing
Some courts have also qualified the common law right of exclusion by a racing association, as it applies to a licensee, premised upon a racing association's monopolistic or "quasi-monopolistic" control of horse racing in the state at the time that it was conducting racing. In those cases, the courts have concluded that a racing association is subject to judicial review for the exclusion of a licensee, and that the racing association must have "cause" for such an exclusion.
In Greenberg v. Hollywood Turf Club, 86 Cal.Rptr. 885
(Cal.App. 1970), an individual licensed by the California Horse Racing Board as a trainer and stable agent was excluded from the grounds of Hollywood Park Race Course by the track's management, the Hollywood Turf Club. Declining to resolve the issue simply by declaring that the Hollywood Turf Club, as a property owner, could exclude persons it does not want on its premises, the court noted that racing associations in California have a "quasi-monopoly," in that the number of tracks in operation at any one time is severely limited. This circumstance, the court reasoned, imposes certain obligations to which other land owners are not subject. In support of this conclusion, the court relied upon the principle that prevents arbitrary exclusions of doctors, orthodontists, motion picture directors, and shipyard workers from professional organizations and unions where, because of a monopoly or "quasi-monopoly," membership is a "practical necessity" for the practice of one's calling.[11]86 Cal.Rptr. at 890. In short, the court held that if a racing association wishes to exclude an individual licensed by a racing commission from its grounds and the exclusion would cause legal injury to the licensee (e.g., by not allowing the licensee to ply his or her trade in the state), the racing association must "justify" its actions.
A similar result was reached in Jacobson v. New York RacingAssociation, Inc., 305 N.E.2d 765 (N.Y. 1973). In that case, Howard Jacobson, an owner and trainer of thoroughbred race horses, had his license restored by the state racing commission after serving a 45-day suspension. Nevertheless, the New York Racing Association denied Jacobson stall space at all three of the major thoroughbred racetracks in New York (Aqueduct, Belmont Park, and Saratoga), virtually barring Jacobson from thoroughbred racing in the state of New York. While recognizing that other courts have extended the common law rule involving the exclusion of patrons to the exclusion of licensees, the New York court qualified the common law rule of exclusion as applied to a licensee. The court reasoned as follows:
 [The racing association] has virtual monopoly power over thoroughbred racing in the State of New York. Exclusion from its tracks is tantamount to barring the plaintiff from virtually the only places in the State where he may ply his trade and, in practical effect, may infringe on the State's power to license horsemen. In contrast to a racetrack proprietor's common-law right to exclude undesirable patrons, it would not seem necessary to the protection of his legitimate interests that the proprietor have an absolute immunity from having to justify the exclusion of an owner and trainer whom the State has deemed fit to license.
305 N.E.2d at 768.[12] The court noted, however, that it would be the plaintiff's "heavy burden to prove that the denial of stall space was not a reasonable discretionary business judgment
but was actuated by motives other than those relating to the best interests of racing generally." Id. (emphasis added). See also Saumell v. New York Racing Association,Inc., 447 N.E.2d 706 (N.Y. 1983) (racing association may exclude a licensed jockey only if it can show "reasonable cause" for such an exclusion); Cox v. National Jockey Club, 323 N.E.2d 104 (Ill. 1974) (racing association with "quasi-monopoly" could not "arbitrarily and without reason or justification" deny a jockey the opportunity to participate in its meet).[13] Cf. Arone v. Sullivan CountyHarness Racing Association, 457 N.Y.S.2d 958 (N.Y.App.Div. 1982) (declining to impose any standard or justification for the exclusion of licensees by a racing association, in the absence of a "quasi-monopoly" over harness racing in New York).
D. Exclusion of Licensees in Maryland
The lack of appellate authority in Maryland and the diversity in cases elsewhere makes it difficult to predict the exact rule of law that the Court of Appeals would adopt, if a licensee exclusion case were to reach the Court. One point is clear, however: The Court would likely conclude that the common law rule remains applicable to licensees. The logic of the out-of-state cases that regulatory control of licensees does not impliedly forfeit racetrack owners' common law right to control access to their property — is compelling, particularly in light of the Court's rejection of a similar implied repeal argument made by an excluded patron. See Silbert v. Ramsey, 301 Md. at 105-07.
While the common law may not be repealed by implication, as the Court of Appeals has pointed out on many occasions, the common law may be abrogated by the enactment of a statute or by a decision of the Court of Appeals. See, e.g., Miles Laboratories,Inc., Cutter Laboratories Div. v. Doe, 315 Md. 704, 724,556 A.2d 1107 (1989); Jones v. State, 303 Md. 323, 337, n. 10,493 A.2d 1062 (1985); Pope v. State, 284 Md. 309, 341-43, 396 A.2d 1054
(1979). Because regulations adopted pursuant to statutory authority have "the force and effect of law," Maryland PortAdministration v. John W. Brawner Contracting Co., 303 Md. 44, 60,492 A.2d 281 (1985), such regulations can also effect a change in the common law. However, our review of the statutory provisions governing the Commission (Title 11 of the Business Regulations ("BR") Article, Maryland Code), and the regulations adopted by the Commission (COMAR Title 9, Subtitle 10) fails to reveal any enactment that abrogates these common law rights.[14]
Therefore, the Court would likely affirm the basic common law property right of a racing association to exclude a licensee.
A closer question is whether the Court of Appeals mightmodify the common law rights of a racing association by requiring a standard of justification for the exclusion. One basis for the Court's potentially doing so, as other courts have done, is monopolistic control of racing.
In regard to thoroughbred racing in Maryland, although a different corporate entity is licensed by the Maryland Racing Commission to conduct thoroughbred horse racing at the State's only mile thoroughbred racetracks, a single individual is the President, Chief Executive Officer, and majority shareholder of both corporate entities; in addition, the other officers of each of the licensed corporate entities are also the same.[15]
Moreover, potential for a perpetuation of this monopolistic control is made possible by BR § 11-510, which prohibits the Commission from issuing a license to, or awarding racing days for, racing at a "new or additional track, unless a race was held at the track at least once each year for the 3 years immediately before May 6, 1943."[16] The only enumerated exceptions apply to the Laurel Racing Association, Inc. if it abandons Laurel Race Course, and to the Maryland Jockey Club of Baltimore City, Inc., if it abandons Pimlico Race Course.
In regard to harness racing in Maryland, by legislative enactment, the Commission may not issue a license to conduct harness racing to more than three racing associations. BR § 11-609. Currently, there are only two operating harness tracks in Maryland — Rosecroft Raceway (located in Oxon Hill) where harness racing is conducted approximately eleven months out of the year, and Ocean Downs (located in Berlin, just west of Ocean City), where harness racing is conducted primarily in the summer months. Both tracks are currently owned by the same corporate entity Cloverleaf Enterprises, Inc., and both tracks are currently managed by the same corporate entity — Bally Manager, Inc. See
Commission Minutes (June 29, 1995).
Thus, if an owner, trainer, or other individual licensed by the Commission is excluded by one of the two racing associations conducting horse racing at either of the mile thoroughbred tracks in Maryland, that licensee is, in effect, unable to ply his or her trade in this state. The same is true of a licensee excluded by the racing association conducting horse racing at the two harness racetracks currently operating in Maryland. Under these circumstances, the Maryland courts might require a racing association to justify the exclusion of a licensee by reference to some standard (e.g., consistency with public policy, sound business judgment, or reasonable cause).
Finally, we note that, under existing law, a racing association is "subject to all rights, regulations, and conditions that the Commission sets for the calendar year in which a race meeting of the racing association is held." BR § 11-305. Thus, if the Commission elected to do so, it could impose, as a condition of a racing association's license, a requirement that any exclusion by the racing association be justified by reference to an enunciated standard. Were the Commission to exercise its discretion in this way, a licensee who contended that he or she was excluded improperly by a racing association would gain a hearing before the Commission, at which the issue would be whether the racing association had violated the imposed condition of licensure. If the Commission concluded that the exclusion was not proper under the standard, the Commission could direct the racing association to rescind its exclusion of the licensee in lieu of disciplinary action.[17]
 IV State Action
We have also considered whether the exclusion of a licensee might give rise to civil rights liability under federal law in either of two circumstances: where, as at present, the Commission plays no role whatever in the racing association's decision to exclude a licensee; and where, if it chose to do so, the Commission created a mechanism for its review of the association's decision. In neither case would federal civil rights laws apply.
Where a racing association has acted independently in excluding an individual licensed by a racing commission, the courts have consistently declined to make a finding of "state action" — that is, that the actions of the racing association were committed under "color of state law." For example, in Lemberos v.Laurel Racecourse, Inc., 489 F. Supp. 1376 (D. Md. 1980), the plaintiff, a trainer of thoroughbred horses, alleged that the racing associations operating the major racetracks in Maryland conspired to deny him stall space at the respective tracks and so precluded him from obtaining entry of his horses at these tracks.[18] Lemberos contended in part that the denial of stall space by the tracks without notice or an opportunity for a hearing constituted a violation of the Due Process and Equal Protection Clauses of the U.S. Constitution and 42 U.S.C. § 1983. In granting the racing associations' respective motions for summary judgment, the court concluded that Lemberos had failed to prove "state action." Specifically, applying the well-known tests developed by the Supreme Court, the district court determined that there was neither a "symbiotic relationship" between the racing associations and the State nor a "close nexus" between the State and the challenged action. 489 F. Supp. at 1381-85. The court observed:
 The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for the purposes of the Fourteenth Amendment. . . . Nor does the fact that the regulation is extensive and detailed . . . . [E]ven though a state may grant a monopoly to a private party, that party's actions do not necessarily constitute state action.
489 F. Supp. at 1382 (citation omitted). Applying these standards, the court found that the State was not "intimately involved" in the denial of stall space by the racing associations, and the actions of the racing associations did not become attributable to the State. Further, the court found that there was not a sufficiently close nexus between the State and the racing associations, noting that the State "was hardly even involved at all." 489 F. Supp. at 1384.
Other jurisdictions have consistently found an absence of "state action" where a racing association effectively excluded an individual from its grounds independent of any action by a state racing commission. See Hadges v. Yonkers Racing Corp.,918 F.2d 1079 (2d Cir. 1990); Bierv. Fleming, 717 F.2d 308 (6th Cir. 1983), cert. denied,465 U.S. 1026 (1984); Heflin v. Kentucky State Racing Commission,701 F.2d 599 (6th Cir. 1983); Fulton v. Hecht, 545 F.2d 540
(5th Cir. 1977); Evans v. Arkansas Racing Commission,606 S.W.2d 578 (Ark. 1980); Catrone v. State Racing Commission,459 N.E.2d at 479. If, however, the exclusion of a licensee by a racing association is based upon information provided to it by the racing commission regarding the actions of a licensee that violate the commission's rules, that action may satisfy the "close nexus" test, and, as a result, "state action" may be found. Fitzgerald v. Mountain Laurel Racing,Inc., 607 F.2d 589 (3rd Cir.), cert. denied.,446 U.S. 956 (1979). Cf. Saumell v. New York Racing Assoc., Inc.,447 N.E.2d at 710-11 (racing association's concession of "state action" led to requirement for due process hearing).
It is also well-established that the "[m]ere approval of, or acquiescence in, the initiatives of a private party is not sufficient to justify holding the state responsible for those initiatives under the terms of the 14th Amendment." Blum v.Yaretsky, 457 U.S. 991 (citing Flagg Bros., Inc. v. Brooks,436 U.S. 149, 164-65 (1978)). See also Jackson v. Metropolitan EdisonCo., 419 U.S. 345, 357 (1974). Therefore, it would appear that a mandated review of a racing association's exclusion of a licensee conducted by a state racing commission, absent any other involvement by the commission, would not, in and of itself, constitute "state action."
 V Conclusion
Founded upon the common law rights of a property owner, a racing association, as the proprietor of a place of amusement, may exclude from its grounds an individual otherwise licensed by the Commission to ply his or her trade in this State independent of any action by the Commission. Although numerous statutory and regulatory provisions describe the authority of the Commission to take disciplinary actions against a racing association and all other licensees, none of these provisions deny, supplant, or otherwise abrogate a racing association's common law right to exclude. In effect, while the Commission has sole authority to license owners, trainers, drivers, jockeys, grooms, and other individuals working on the grounds of a racetrack,[19] a license does not provide the licensee with a guarantee of the right to use that license on the grounds owned and operated by a racing association.
While some courts have upheld the exclusion of a licensee by a racing association without cause, others, particularly in those jurisdictions where a racing association is deemed to enjoy monopolistic or "quasi-monopolistic" control of horse racing, require that the exclusion be justified and not made with impunity. Considering the current monopolistic control of both the mile thoroughbred race tracks and the harness race tracks in Maryland, Maryland courts may well require that the exclusion of a licensee by a racing association be justified in some reasonable way. In addition, the Commission has authority to impose a standard for exclusion of a licensee by a racing association through a regulation or licensing condition.
Provided the exclusion of a licensee by a racing association is wholly independent of any involvement by the Commission, the exclusion does not constitute "state action," and, as a result, the constitutional guarantees of due process are not applicable.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Bruce C. Spizler Assistant Attorney General
_________________________ Jack Schwartz Chief Counsel Opinions Advice
[1] A racing association is an individual or entity "licensed by the Commission to conduct a meeting where horse racing is permitted for any stake, purse, or reward." COMAR 09.10.01.01B(3).
[2] On "Maryland Million" day, a series of races for Maryland-bred thoroughbred race horses is run with the aggregate purses for the day totaling $1 million.
[3] See note 5 below.
[4] The Supreme Court's holding was premised upon the common law rule that a ticket of admission does not create a right inrem. See 227 U.S. at 636.
[5] Although the Maryland appellate courts have not had occasion to address this issue, several trial court decisions in the State have upheld a racing association's exclusion of a licensee. Callahan v. Rosecroft Racing, Inc., Law No. 83-4378, P.G. County Circuit Court (Blackwell, J., 1983), aff'd on groundsof mootness, Callahan v. Rosecroft Racing, Inc., No. 1673, Md. Ct. Sp. App., Sept. Term, 1983 (unreported, per curiam); Shockey v.Maryland Jockey Club of Baltimore City, Inc., CAE 88-099050, P.G. County Circuit Court (Ross, J., 1988); Wagner v. Maryland RacingCommission, et al., CAE 89-23890, P.G. County Circuit Court (Ahalt, J., 1990).
[6] In Massachusetts, a regulation expressly authorizes a racetrack, independent of the racing commission, to refuse entries without explanation. In Maryland, except in limited circumstances, a racing association may not refuse to accept entries. See
COMAR 09.10.01.17 (thoroughbred); COMAR 09.10.02.17 (harness).
[7] In Maryland, there are no provisions for a review by the Commission of a racing association's exclusion of a licensee.
[8] The court declined to "draw with precision the boundaries of permissible exclusion of licensed persons." 459 N.E.2d at 477.
[9] The court also held that this limitation on the common law right to exclude was equally applicable to patrons. Id.
[10] Maryland case law is similar. The Court of Appeals has held that an employer may not discharge an at-will employee "when the motivation for the discharge contravenes some clear mandate of public policy." Adler v. American Standard Corp.,291 Md. 31, 47, 432 A.2d 464 (1981). A public policy mandate ordinarily derives from a statute. Molesworth v. Brandon, 341 Md. 621,630, 672 A.2d 608 (1996); Watson v. Peoples Ins. Co.,322 Md. 467, 478, 588 A.2d 760 (1991).
[11] The Maryland Court of Appeals has also recognized this principle. See Grempler v. Multiple List. Bureau,258 Md. 419, 426-429, 266 A.2d 1 (1970).
[12] Like the California court in Greenberg v. HollywoodTurf Club, the New York court relied on the general principle that the arbitrary action of a private association is not immune from judicial scrutiny — for example, as applied in instances of a private hospital's arbitrarily denying a licensed physician staff privileges. The court concluded that the situation before it was sufficiently analogous to warrant application of this principle.
[13] The holding in Cox, requiring a reason or justification for the exclusion of a licensee by a racing association, was later codified into law mandating that the exclusion be based upon "just cause." See Brooks v. Chicago Downs Association, Inc.,791 F.2d 512 (7th Cir. 1986).
[14] Thirty-eight years ago, this office addressed the authority of a racing association to deny certain owners and trainers the right to enter their horses at a racetrack. In 43 Opinions of theAttorney General 271 (1958), Attorney General Sybert noted the express regulations adopted by the Commission regarding the acceptance of entries by a racing association. Pursuant to these regulations, a racing association could refuse the entry of a horse in a race only if the horse was not eligible to participate in the race in which it was being entered or the horse was not physically sound enough to compete in the race. In one passage, however, the Attorney General commented more broadly:
 It is the responsibility of the Racing Commission to control and regulate racing within the State, and not the associations. If the associations were able to prevent duly licensed horsemen from participating at their tracks, it would, in effect, be a power to veto and override the discretion exercised by the Racing Commission in granting licenses to persons it believes duly qualified to participate in racing within the State.
43 Opinions of the Attorney General at 272. This passage does not reflect consideration of the common law right of a racing association to exclude a licensee without any prior action by the Commission. Nevertheless, we do not overrule the opinion, because the specific issue involved in the opinion, the acceptance of entries by a racing association, was resolved by applying regulations expressly applicable to the subject.
[15] The licensee for Laurel Park is the Laurel Racing Association, Inc., the general partner of Laurel Racing Association Limited Partnership. The licensee for Pimlico is the Maryland Jockey Club of Baltimore City, Inc., a subsidiary of Pimlico Racing Association, Inc. The officers are listed in the racetracks' financial statements and daily programs.
[16] The only two existing locations that satisfy this criteria are the former Bowie Race Course, now operated as a training center by legislative mandate, see BR § 11-519; and the former Havre de Grace Race Course, which has been demolished.
[17] We hasten to add that it is not the purpose of this opinion, nor the role of this office, to comment on the policy considerations within the Commission's purview or the advisability of any regulatory or legislative change.
[18] In 1978, Lemberos had been assigned one stall at Timonium, a half mile track where thoroughbred racing is conducted ten days a year during the Maryland State Fair; however, he occupied more than one stall and refused to vacate the other stalls when the racing association requested him to do so. When this situation was brought to the attention of the other owners of the racetracks in Maryland, each decided that they did not want to assign stalls to Lemberos. 489 F. Supp. at 1385.
[19] COMAR 09.10.01.25(A) (thoroughbred) and 09.10.02.19(A) (harness) provide for 23 categories of licenses issued by the Commission.
 *Page 186